**TUSCUMBIA CITY SCHOOL SYSTEM, on behalf of itself and all others similarly situated, Plaintiff,**

v.

**PHARMACIA CORPORATION, Defendant.**

**Civil Action No. CV–12–S–332–NW.**

United States District Court, N.D. Alabama, Northwestern Division.

June 27, 2012.

Andrew S. Herring, Courtney L. Peinhardt, D. Frank Davis, John E. Norris, Wesley W. Barnett, Davis & Norris LLP, Birmingham, AL, for Plaintiff.

Augusta S. Dowd, J. Mark White, Linda G. Flippo, White Arnold & Dowd PC, Matthew H. Lembke, Michael R. Pennington, Bradley Arant Boult Cummings LLP, Birmingham, AL, Thomas M. Goutman, White & Williams LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION AND ORDER

LYNWOOD SMITH, District Judge.

The plaintiff in this action is the public school system of the City of Tuscumbia, Alabama. It commenced this diversity jurisdiction case as a putative class action against defendant, Pharmacia Corporation, alleging one count of negligence and one count of wantonness or recklessness in the design, manufacture, and marketing of electric ballasts for fluorescent light fixtures containing "the now-banned toxic chemicals known as Polychlorinated Biphenyls ('PCBs')," and with knowledge that: PCBs were toxic; that failing ballasts release PCBs into classrooms like those maintained by the plaintiff; and, that "PCBs could cause systemic toxic injuries" to humans.[1] Defendant moved to dismiss the action for failure to state a claim upon which relief can be granted.[2] Following consideration of the pleadings, motion, briefs, and research the motion will be denied.

---

1. Doc. no. 12 (Amended Complaint), at 1–2.

2. *See* doc. no. 15 (Motion to Dismiss).

## I. STANDARDS FOR REVIEWING RULE 12(b)(6) MOTIONS TO DISMISS

Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." That rule must be read in conjunction with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While that pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 550, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citations omitted).

A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Twombly*, 550 U.S. at 555, 127 S.Ct. 1955]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S.Ct. 1955.

To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id.*, at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557, 127 S.Ct. 1955 (brackets omitted).

Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555, 127 S.Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556, 127 S.Ct. 1955. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [*Iqbal v. Hasty*], 490 F.3d [143] at 157–158 [ (2d Cir.2007) ]. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While *legal conclu-*

*sions* can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal,* 556 U.S. at 678–79, 129 S.Ct. 1937 (emphasis added).

When ruling upon a motion to dismiss, the court must assume that all well-pleaded facts alleged in the plaintiff's complaint are true. *See Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 453, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) (stating that on a motion to dismiss, the court must "accept as true the factual allegations in the amended complaint"); *Marsh v. Butler County,* 268 F.3d 1014, 1023 (11th Cir. 2001) (*en banc*) (setting forth the facts in the case by "[a]ccepting all well-pleaded factual allegations (with reasonable inferences drawn favorably to Plaintiffs) in the complaint as true"). Accordingly, the statements contained in the following part of this opinion as the "facts" for Rule 12(b)(6) purposes may, or may not, be the actual facts. *See, e.g., Williams v. Mohawk Industries, Inc.,* 465 F.3d 1277, 1281 n. 1 (11th Cir.2006).

## II. BACKGROUND FACTS

The Tuscumbia City School System is a public school district in Colbert County, Alabama.[3] Defendant, Pharmacia Corporation, is a Delaware corporation with its principal place of business in New Jersey. It is a wholly owned subsidiary of Pfizer, Inc. It also is the successor in interest of Monsanto Company,[4] which manufactured PCBs from 1929 until 1979.[5] Monsanto was the sole U.S. manufacturer of PCBs, which "do not occur in nature," [6] and the chemicals were not imported in any significant amounts.[7]

PCBs are hazardous chemicals, so much so that Congress specifically outlawed their manufacture in the Toxic Substances Control Act of 1976.[8] Exposure to PCBs can occur in many forms. Skin contact, inhalation of vapors emitted by heated PCBs, and ingestion of the chemicals are all hazardous.[9] The chemicals are a known carcinogen, and are deleterious to a person's immune, reproductive, nervous, and endocrine systems.[10] They also can reduce cognitive abilities.[11] For example, children exposed to PCBs may exhibit reduced IQs and altered behaviors.[12]

Prior to the Congressional Act banning the production of PCBs, the chemicals were used, among other purposes, in the assembly of "ballasts" for fluorescent light fixtures.[13] A "ballast" is the device that controls the amount of electricity flowing into the fluorescent tube.[14] "Essentially all ballasts manufactured for fluorescent light fixtures before 1979 contain liquid

3. *See* doc. no. 12 (Amended Complaint) ¶ 1.

4. *Id.* ¶¶ 2, 3.

5. *Id.* ¶ 12.

6. *Id.* ¶ 10.

7. *Id.* ¶ 11.

8. *See* Pub.L. 94–469 § 6(e), 90 Stat.2003 (1976) (codified as amended at 15 U.S.C. § 2605(e) (2008)). The ban on the production of PCBs did not go into effect until 1979. *See also* doc. no. 12 (Amended Complaint) ¶ 13 ("PCBs are the only toxic substance whose manufacture is specifically outlawed by this act.").

9. *Id.* ¶ 9.

10. *Id.* ¶ 14.

11. *Id.* ¶ 15.

12. *Id.*

13. Doc. no. 12 (Amended Complaint) ¶ 7.

14. *Id.*

PCBs."[15] The danger to humans and the environment lies coiled in the fact that ballasts containing PCBs are known to leak, fail, and overheat.[16] Indeed, all ballasts eventually fail.[17] The devices are especially prone to overheating when they fail,[18] When a ballast containing PCBs fails, it releases the chemicals into the atmosphere and environment.[19]

As early as 1937, studies showed the toxicity of PCBs.[20] Despite Monsanto's awareness of the dangers inherent in exposure to PCBs, the company did not inform the public of the health risks associated with exposure to devices containing the chemicals. In fact, the company sought to hide the dangers from the public.[21] Monsanto's attempt to cover up the danger of PCBs lasted from the 1930s through the 1970s.[22] Monsanto sold PCBs to manufacturers of fluorescent light fixtures, despite its knowledge that PCBs were stable chemicals that would linger in the environment for years after being released *via* ballast failures.[23]

Prior to the 1979 Congressional ban on manufacturing PCBs, the chemicals were used in all ballasts installed in fluorescent light fixtures, including those placed in school buildings.[24] The Tuscumbia City School System owns and operates schools that contain pre–1979 fluorescent light fixtures operated by ballasts containing

PCBs.[25] The release of PCBs from failing ballasts has made the school buildings unsafe, exposing students, faculty, administrators, and adjunct staff to potential harm.[26] The release of PCBs constitutes manifest property damage, similar to the property damage caused by the escape of asbestos fibers into a school's environment.[27]

## A. Procedural Facts

The School System's initial complaint was filed on January 31, 2012.[28] Defendant responded with a motion to dismiss, together with an unopposed motion to stay discovery pending the court's ruling on the motion to dismiss.[29] Plaintiff filed an amended complaint on April 20, 2012.[30] Defendant filed the motion to dismiss that is addressed in this opinion on April 27, 2012.[31]

## III. DISCUSSION

Defendant argues that, under Alabama law, it is not liable to the ultimate consumer of products manufactured by its predecessor in interest *unless* there was privity of contract between that manufacturer and the ultimate consumer (here, the plaintiff), or the latter was within the foreseeable zone of risk on the date of the initial sale of the goods to the original purchaser (the

---

15. *Id.* ¶ 8.

16. *Id.*

17. *Id.* ¶ 32.

18. Doc. no. 12 (Amended Complaint) ¶ 8.

19. *See id.* ¶ 8.

20. *Id.* ¶ 17.

21. *Id.* ¶¶ 17–26.

22. *Id.*

23. Doc. no. 12 (Amended Complaint) ¶ 21.

24. *Id.* ¶ 8.

25. *Id.* ¶ 29.

26. *Id.* ¶ 30.

27. *Id.* ¶ 31.

28. *See* doc. no. 1 (Complaint).

29. *See* doc. nos. 6 (Motion to Dismiss), 8 (Motion to Stay).

30. *See* doc. no. 12 (Amended Complaint).

31. *See* doc. no. 15 (Motion to Dismiss Amended Complaint).

manufacturer of the fluorescent light fixtures purchased by plaintiff). In other words, defendant asserts that, unless Monsanto knew of the specific identity of the Tuscumbia City School System, and the risk posed for students, faculty, administrators, and other personnel occupying the System's school buildings, on the dates it sold ballasts containing PCBs to the manufacturer(s) of the lighting fixtures installed in plaintiff's schools, then defendant is not liable for the alleged negligence of its predecessor in interest. Plaintiff responds that neither privity of contract nor the foreseeability of risk is necessary to sustain a negligence claim against the manufacturer of an inherently hazardous product.

## A. *"A page of history is worth a volume of logic."* New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921) (Holmes, J.).

This is not the first occasion on which the undersigned judicial officer has been required to weigh the same arguments in a similar context. Indeed, while serving as a Judge of the Twenty–Third Judicial Circuit for the State of Alabama (Madison County), the undersigned presided over an action commenced by the Huntsville City Board of Education against the five major manufacturers of spray-applied acoustical, fireproofing, and insulation materials containing high levels of asbestos that had been purchased by the plaintiff and installed in public school buildings erected in Huntsville between 1957 and 1967: *i.e., Huntsville City Board of Education v. National Gypsum Company, et al.,* No. CV–83–325L (Mad. Co. Ala. Cir. Ct., filed Mar. 24, 1983). The school board alleged that the products presented a danger to the health of students, teachers, administrators, and maintenance personnel who occupied those buildings. The pivotal issue in the case was the question of whether the school board could recover damages for "economic losses" under a common-law tort action for negligence, or Alabama's hybridized variant of the theory of strict liability in tort, the so-called "Alabama Extended Manufacturer's Liability Doctrine." That was a question of first impression in Alabama, and national opinion on the issue was fragmented. This judge's opinion on the defendants' various motions to dismiss, for judgment on the pleadings, and for summary judgment was among the first to analyze all cases then addressing those questions, and established a clear rationale for the recovery of economic loss damages under a tort theory. A copy of the opinion entered in that case on August 27, 1984 is attached to this opinion as Exhibit "A." The relevant law has not changed appreciably or in a substantive manner during the (nearly) twenty-eight intervening years. Accordingly, this judge's 1984 opinion is ratified, affirmed, and adopted as the basis of this court's present rulings, just as fully as if the opinion were set out at this point *in haec verba.* The following discussion, therefore, should be construed as merely a gloss upon that which was more fully expressed in the earlier opinion.

## B. The Alabama Extended Manufacturer's Liability Doctrine

■ The Tuscumbia City School System cites several cases that track the development of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). Plaintiff first points to *Jones v. Gulf States Steel Co.,* 205 Ala. 291, 88 So. 21 (1921), in which the Alabama Supreme Court acknowledged an exception to the traditional requirement for showing privity of contract between a defendant and a plaintiff "where the thing causing the injury is of an obnoxious or dangerous character." *Id.* at 22. The defendant in *Jones* was a coal mine operator, and the plaintiff was a person who had been injured when a lump of coal mined by the defendant and sold to

the plaintiff's husband exploded. The plaintiff alleged that some employee of the defendant had negligently left explosive material in the coal lump. The Alabama Supreme Court observed that an exception to the requirement of privity for consumer products that possess an "obnoxious or dangerous character"

> grew out of the necessity of the case, sustaining a wise public policy for the protection of human life and health, and placed upon the manufacturer and vendor of drugs, foods, and beverages, a high degree of care because of their superior knowledge of the articles manufactured, and the necessary reliance which the public must place upon them. As expressed in *Magetti v. Armour & Co.*, 75 Wash. 628, 135 Pac. 635, 48 L.R.A.(N.S.) 223, Ann. Cas. 1915C, 142, *supra*, that such manufacturers "having an opportunity to investigate, and thereby know the quality of their merchandise," are charged with a high degree of responsibility, and in manufacturing and placing on the market for the consumption of the general public, the law requires of them the exercise of a high degree of care to determine that no foreign and deleterious substance shall enter into the article, and that the public shall not be deceived thereby.

*Id.* at 23. Ultimately, however, the Court affirmed the trial court's dismissal of the plaintiff's claim, because

> the defendant was not dealing with a dangerous article, and one from the use of which any harm would reasonably be anticipated. There is no averment that the defendant knew of the existence of this explosive in the lump of coal, nor is there anything to indicate that it was the duty of the defendant to inspect the coal before allowing the plaintiff's husband to

procure the same for domestic purposes. Indeed, we think it must be admitted that the unfortunate accident here set up is most unusual. . . .

*Jones v. Gulf States Steel Co.*, 88 So. at 23.

■ As discussed more fully in Exhibit "A," the Alabama Supreme Court formally restated the elements of a manufacturer's liability claim in two cases decided on the same day, *Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala.1976), and *Casrell v. Altec Industries, Inc.*, 335 So.2d 128 (Ala.1976), and thereby christened the "extended" manufacturers' liability doctrine that is generally referred to by its acronym, "AEMLD." [32] The *Atkins* court framed the elements of a *prima facie* AEMLD claim in the following manner:

(1) A plaintiff must prove he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

   (a) the seller was engaged in the business of selling such a product, and

   (b) it was expected to, and did, reach the user or consumer without substantial change in the condition in which it was sold.

(2) Having established the above elements, the plaintiff has proved a *prima facie* case although

   (a) the seller had exercised all possible care in the preparation and sale of his product, and

   (b) the user or consumer had not bought the product from, or entered into any contractual relation with, the seller.

*Atkins*, 335 So.2d at 141.

■ As the quoted text makes clear, plaintiffs may rely on AEMLD in assert-

---

**32.** *See* Exhibit "A," *Huntsville City Bd. of Educ. v. National Gypsum Co.*, No. CV–83–325L, slip op. at 42–45 (Mad.Co.Ala.Cir.Ct., Aug. 27, 1984) (discussing *Atkins* and *Casrell* ).

ing claims for both personal injury and property damage. The *Atkins* court emphasized, nevertheless, that, in announcing the "extended" manufacturer' liability doctrine, Alabama courts were *not* adopting the strict tort liability regime that prevailed in some sister states; rather, "selling a dangerously unsafe product is negligence as a matter of law." *Id.*

More recent decisions of the Alabama Supreme Court have clearly stated that AEMLD is a stand-alone tort, *separate from* the common-law action for negligence, rather than a manner of proving negligence; and that the new tort stands in contrast to, *e.g.*, the doctrine of *res ipsa loquitur. See Spain v. Brown & Williamson Tobacco Corp.*, 872 So.2d 101, 105–06 (Ala.2003); *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So.2d 28, 35 (Ala.2003). *See also McMahon v. Yamaha Motor Corp., U.S.A.*, No. 1100679, 95 So.3d 769, 771–72, 2012 WL 677548, at *2 (Ala. Mar. 2, 2012) (citing *Tillman,* and noting that negligence and AEMLD "have different elements that must be proven").

Plaintiffs often assert both AEMLD claims and traditional common-law tort claims in the same actions. *See, e.g., McMahon*, 95 So.3d at 770–71, 2012 WL 677548 at *1; *Spain*, 872 So.2d at 102; *Tillman*, 871 So.2d at 29; *Keck v. Dryvit Systems, Inc.*, 830 So.2d 1, 3 (Ala.2002). In the present case, however, the Tuscumbia City School System has not asserted an AEMLD claim. Instead, it only alleges common-law claims for the negligence and wantonness (or recklessness) of defen-

dant's predecessor in interest. As the Alabama Supreme Court stated in *Spain* and *Tillman,* those common-law tort theories are separate from an AEMLD claim. Therefore, and despite plaintiff's reliance on AEMLD cases in its brief, this court must focus on the rules applicable to the common-law tort theories actually asserted in the complaint.[33]

## C. Analysis of Plaintiff's Negligence Claim

Plaintiff argues that, as a "general principle," "privity is not required to recover *in negligence* for the sale of a hazardous product." [34] However, plaintiff relies primarily on *AEMLD* cases to develop that argument. Plaintiff states that privity is not required, regardless of whether the case involves personal injury or property damage, and that the critical distinction is that between hazardous and non-hazardous products.[35] Defendant, on the other hand, argues that privity is still required in negligence cases alleging only property damage.

The facts outlined in the complaint demonstrate the dangers that PCBs pose to humans, and the risk of exposure from ballasts that leak, fail, or overheat in fluorescent light. The *actual harm* for which the Tuscumbia City School System seeks damages in this case, however, is not compensation for personal injuries already sustained by any particular person, but instead, damage to property *other than* the fluorescent light ballasts manufactured by defendant's predecessor in interest. Spe-

---

33. Note well that, even though the plaintiff's complaint asserts a claim of wantonness or recklessness, in addition to the School System's negligence claim, the parties focus exclusively on the concepts of negligence in their briefs. So, therefore, shall this court focus upon that theory in the following discussion.

34. Doc. no. 17 (Plaintiff's Response in Opposition to Defendant's Motion to Dismiss), at 13 (emphasis in original).

35. *See also* Exhibit "A," *Huntsville City Bd. of Educ. v. National Gypsum Co.,* No. CV–83–325L, slip op. at 37–40 (Mad.Co.Ala.Cir.Ct., Aug. 27, 1984) (discussing *Atkins* and *Casrell* ).(discussing the "dangerous-nondangerous" distinction).

cifically, and based upon the proposition that "[t]he release of PCBs into the environment of [plaintiff's schools] is a form of manifest, present *property* damage," [36] the Tuscumbia City School System asks that defendant be compelled to pay: the costs of inspecting its school buildings to determine which fluorescent light fixtures have ballasts containing PCBs, *and*, whether other property in each school building has been contaminated by PCBs that were emitted by ballasts that leaked, failed, or overheated; the costs of removing, replacing, and disposing of the affected ballasts; and, "any and all costs reasonably incurred to remediate the PCB-containing ballasts and all resulting harm" to the plaintiff's property.[37]

### 1. Privity requirement in property damage cases

The case upon which defendant principally relies is *Keck v. Dryvit Systems, Inc.*, 830 So.2d 1 (Ala.2002). The plaintiffs in that case brought numerous claims based on the failure of an artificial stucco siding compound that was not impervious to water, and allowed moisture to enter their home. *Id.* at 3–4. The plaintiffs had purchased the house from a previous owner, who had commissioned its construction. *Id.* at 4. One of their claims sounded in negligence, and alleged that they were foreseeable victims of the stucco siding's failure and, thus, had been owed a duty of reasonable care by the defendant-manufacturer. *Id.* at 10.[38] The trial court granted summary judgment on that claim because the plaintiffs had "failed to present substantial evidence of personal injury necessary to avoid the application of the doc-

trine of *caveat emptor*." *Id.* at 4. On appeal, the Alabama Supreme Court first stated that the lack of privity between plaintiffs and defendants barred plaintiffs' claim. *Id.* at 9 (citing *Boackle v. Bedwell Construction Co.*, 770 So.2d 1076, 1081 (Ala.2000) (holding that a homebuyer must be in privity of contract with homebuilder to sue the builder for negligent construction)). The Court then stated that, even if the rule of privity did not bar recovery, the plaintiffs' claim still would fail because, as subsequent purchasers of the house, they were not in a foreseeable area of risk, such that the defendants owed them a duty of care. *Id.* at 9–10. In reaching that conclusion, the Court rejected the plaintiffs' wholly logical argument that it was clearly foreseeable that a house would, at some point, be sold to someone other than the original purchaser. *See id.*

Defendant also relies on *Copenhagen Reinsurance Co. v. Champion Home Builders Co., Inc.*, 872 So.2d 848 (Ala.Civ. App.2003). In that case, the Alabama Court of Civil Appeals held that privity of contract was required for the owners of a mobile home to assert an action against its manufacturer. *Id.* at 855–56. The court relied upon the decision in *Keck* for the proposition that a plaintiff must be either in privity of contract with the defendant manufacturer, or his injury must be foreseeable. *Id.* Defendant argues that *Keck* and *Copehhagen Reinsurance* demonstrate that the Tuscumbia City School System must either show privity or foreseeability in order to maintain a negligence action for the recovery of property damages only, regardless of whether the product is characterized as dangerous or nondangerous.

---

**36.** Doc. no. 12 (Amended Complaint) ¶ 30 (alteration and emphasis supplied).

**37.** *Id.* at 17–18.

**38.** Before addressing the plaintiffs' negligence claim, the *Keck* court dismissed the AEMLD

claim on the counter-intuitive basis that the faux stucco siding was not a "product" and, therefore, not an inherently dangerous or defective "product" as required by AEMLD. *Keck*, 830 So.2d at 7.

### 2. The significance of a hazardous product

Plaintiff argues that "the cases cited by Monsanto [*sic*] are completely wide of the mark," because neither involved a product alleged to be inherently hazardous or dangerous to human health.[39] Indeed, there is nothing of "an obnoxious or dangerous character" about either imitation stucco siding or mobile homes.[40] Plaintiff further argues that there is no distinction between cases alleging personal injuries and those alleging property damage, citing *Harris v. Board of Water and Sewer Commissioners of City of Mobile*, 294 Ala. 606, 320 So.2d 624 (1975), a pre-AEMLD case. The plaintiff in that action sued the municipal governmental agency responsible for maintaining the city's fire hydrants. A fire had destroyed his hotel and restaurant, and he alleged that an inadequate supply of water to the nearest hydrant was a direct and proximate cause of his property loss. *Id.* at 626. The Alabama Supreme Court determined that the plaintiff was a third-party beneficiary of the contract between the City of Mobile and its water board and, thus, entitled to bring an action if injured by the board's "breach of the contract to supply water or its negligent maintenance of nonfunctioning fire hydrants .…." *Id.* at 628. The Court stated that the plaintiff also could recover in tort under a theory of manufacturer's liability, as applied to the supplier. First, the Court stated that the plaintiff was squarely within the foreseeable area of risk attendant to a contract to provide fire hydrant services. *Id.* at 630. In that regard, the plaintiff's ability to recover in tort was essentially identical to his ability to recover as a third-party beneficiary in contract. Significantly, the Court also stated that he could recover on the basis that a non-functioning fire hydrant is an inherently dangerous

product, a theory of negligence requiring no privity of contract. *Id.*

> If the product in question, although not inherently or imminently dangerous in itself, becomes so when applied to its intended use in the usual and customary manner, and an injury is sustained as the natural and proximate result of the use of that article, then the manufacturer is liable to the user. *Defore v. Bourjois, Inc.*, 268 Ala. 228, 105 So.2d 846 (1958). The fireplug was to be used in the usual and customary manner and the injury was sustained as the natural and proximate result of the inability to use that article, according to Harris's complaint. What can be more imminently dangerous that a fireplug that does not function when it is needed to fight a fire?

*Harris,* 320 So.2d at 630 (citing *Doyle v. South Pittsburgh Water Co.,* 414 Pa. 199, 199 A.2d 875, 879 (1964) (holding that, even if the municipal water company had no duty to provide fire hydrants in the first place, once the hydrants were installed, the water company assumed an imperative duty to see that reasonable care was exercised in the maintenance and repair of the hydrants) (internal quotation marks omitted)).

■ Although the *Harris* opinion demonstrates that a plaintiff may recover in negligence for property damages caused by an inherently dangerous product, the property damage at issue in that case is distinct from the damage alleged in this case. *Harris* involved direct, traditional property damage: the plaintiff's hotel was burned to the ground as a result of the defective fire hydrant. Here, plaintiff does not allege that PCBs destroyed its schools. Rather, plaintiff alleges that its injury is the ongoing hazardous conditions in its schools. Thus, the court must turn

---

**39.** Doc. no. 17 (Plaintiff's Response to Motion to Dismiss), at 14.

**40.** The quotation is from *Jones v. Gulf States Steel Co.,* 88 So. at 22, discussed *supra.*

its attention to the classification of property damage.

### 3. The "economic loss rule"

■ Property damages can be divided into two broad categories: traditional property damage (*e.g.,* the fire in *Harris* ) and "economic losses." Economic losses can be further divided into subcategories. Direct economic losses comprise losses associated with repairing or replacing the defective product, and the loss of the benefit of the bargain. Consequential economic losses encompass the indirect losses, such as the loss of business, that often accompany a defective product. The damages plaintiff alleges do not fit neatly into those categories, but probably are best classified as direct economic losses. That classification is evident from plaintiff's prayer for relief, in which, as previously noted, the School System requests that defendant be ordered to pay for: the costs of inspecting its school buildings to determine which fluorescent light fixtures have ballasts containing PCBs, *and,* whether other property in each school building has been contaminated by PCBs that were emitted by ballasts that leaked, failed, or overheated; the costs of removing, replacing, and disposing of the affected ballasts; and, "any and all costs reasonably incurred to remediate the PCB-containing ballasts and all resulting harm" to the plaintiff's property.[41]

■ Thus, the central question in ruling on defendant's motion to dismiss is: Can a plaintiff sustain an action grounded in the common-law theory of negligence for direct economic losses caused by a hazardous product under Alabama law? The short answer to that question is "Yes."

■ In Alabama, a products-liability plaintiff cannot recover for the damage to, or destruction of, the defective product

itself under the so-called "economic loss rule." *See Lloyd Wood Coal Co. v. Clark Equipment Co.,* 543 So.2d 671, 672 (Ala. 1989) (citing *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)). The purpose of the economic loss rule is to prevent contract law from being swallowed by tort remedies. Contract remedies and warranty claims are the proper means to resolve the problems arising from products that fail to perform, either at all or as warranted. *See id.* at 673–74 (quoting *East River* at length). The justification for the economic loss rule fades when the product must be replaced or repaired, not because the product failed to perform, but because it is dangerous.

A recent decision of the United States District Court for the Eastern District of Louisiana discussed the applicability of the Alabama economic loss rule to a set of facts similar to those alleged by the plaintiff in this case, and by the Huntsville Board of Education in the state-court case attached as Exhibit "A." *In re Chinese Manufactured Drywall Products Liability Litigation,* 680 F.Supp.2d 780 (E.D.La. 2010). That case arose in the aftermath of Hurricanes Katrina and Rita. *Id.* at 782. The massive rebuilding efforts in the Gulf region put a strain on the nation's supply of construction materials, and some contractors turned to Chinese drywall suppliers. *Id.* The owners of homes containing drywall manufactured in China began to complain of emission of odors and corrosion of household appliances. *Id.* Others experienced "headaches, nosebleeds, difficulty breathing and other physical afflictions believed to be caused by the Chinese drywall." *Id.* The homeowners brought suit against the builders who installed the Chinese drywall, the manufacturers thereof, and a host of others involved in the process of exposing them to the drywall.

**41.** *Id.* at 17–18.

*Id.* The court denied a motion to dismiss, brought under the economic loss rule, and provided a helpful explanation of that rule.

Alabama adopted the ELR [*i.e.*, "Economic Loss Rule"] in *Lloyd Wood Coal Co. v. Clark Equipment Co.*, 543 So.2d 671 (Ala.1989), to hold that tort claims for a defective front-end loader that caught fire were barred by the ELR. Subsequently, the Alabama Supreme Court applied the ELR to bar plaintiff's tort claims in *Wellcraft Marine, a Division of Genmar Industries, Inc. v. Zarzour*, 577 So.2d 414 (Ala.1990), where a boat was damaged as a result of manufacturing defects in the boat. More recently, the court addressed the ELR in *Bay Lines, Inc. v. Stoughton Trailers, Inc.*, 838 So.2d 1013 (Ala.2002), which involved tort claims for economic losses as a result of the delamination of fiberglass panels on freight trailers. The court held that the ELR barred such claims because the only damage was to the panels themselves and "increased costs of doing business and customer displeasure are precisely the sorts of risks that can be considered before entering into a contract and that can be allocated in the contract." *Id.* at 1020. Each of these cases is factually distinguishable from the instant matter. In *Lloyd Wood*, the front-end loader was not performing as such because it caught fire, in *Wellcraft*, the boat was not operating because of defective parts in it, and in *Bay Lines*, the fiberglass panels on the trailers were no longer sufficiently protecting the trailers. In the instant matter, the Chinese drywall has not been destroyed, nor has it ceased to functioned [*sic*] for its intend-

ed purpose; rather, it is contaminating the health and homes of the Plaintiffs. Further, the instant matter goes beyond the concerns in *Bay Lines* of "increased costs of doing business" and "customer displeasure," to concerns with the destruction of Plaintiffs' homes and the deterioration of Plaintiffs' health.

*Id.* at 795 (bracketed alteration supplied).

■■ The economic loss damages claimed by the Tuscumbia City School System are not a consequence of a "defect" in the product that renders it unusable. Rather, plaintiff alleges that the *inherently hazardous nature* of the products necessitates their removal from its school buildings.[42] Plaintiff's claims, like those of the plaintiffs in the *Chinese Manufactured Drywall* cases and the Huntsville Board of Education case referenced in Exhibit "A," are based in the contamination of buildings constructed with materials containing a hazardous substance. Thus, they are not subject to the economic loss rule. The hazardous nature of PCBs easily distinguishes the facts here from those in *Keck* and *Copenhagen Reinsurance*, which involved only ineffective home construction. Moreover, in those cases, as in *Lloyd Wood*, *Wellcraft*, and *Bay Lines*, the defective products themselves, *i.e.*, the homes, sustained the damages. Here, although plaintiff's damages can be categorized as "economic losses," the damages are not just to the products themselves. The inspection, replacement, and remediation costs plaintiff seeks to recover stem from the hazardous nature of the products, not their inability to perform as advertised.[43] Therefore, no privity or foreseeability is required for plaintiff to recover against defendant.

42. *See* Exhibit "A," *Huntsville City Bd. of Educ. v. National Gypsum Co.*, No. CV–83–325L, slip op. at 48 (Mad.Co.Ala.Cir.Ct., Aug. 27, 1984) ("This case is not instituted, therefore, by a *disappointed* user. Rather, it has been brought by the School Board on behalf of those persons who are *endangered* by defendants' products.") (emphasis in original).

43. *See id.* at 49 ("[T]he expenses really are *not* 'economic losses' in the sense of an *expectation loss* but, rather, the expenses have been

## IV. CONCLUSIONS AND ORDER

For the foregoing reasons, defendant's motion to dismiss is DENIED. Defendant's initial motion to dismiss and defendant's motion to stay discovery are DENIED as moot. Defendant is ORDERED to file its answer on or before July 9, 2012. The parties are ORDERED to conduct a discovery planning conference pursuant to Federal Rule of Civil Procedure 26(f) and the ALND Uniform Initial Order Governing All Proceedings, and to file a report of that conference on or before July 17, 2012.

### EXHIBIT A

Copy of Slip Opinion Entered In

*Huntsville City Board of Education v. National Gypsum Company, et al.*, No. CV–83–325L

(Mad.Co.Ala.Cir.Ct., Aug. 27, 1984)
*MEMORANDUM OF OPINION*

#### I. SUMMARY OF CASE

This is an action seeking damages for the costs of removing asbestos products from public school buildings.

The case was started on March 24, 1983. The original plaintiff was the Huntsville City Board of Education.[1] Five of six, original defendants [2] are said to have manufactured "spray-applied acoustical and fireproofing products" and "insulation materials placed on boilers and pipes" which were purchased by the plaintiff and installed in public school buildings erected between 1957 and 1967 (Amended Complaint ¶¶ 4–6); [3] *i.e.*, 17 to 27 years ago. Nonetheless, the School Board alleges it only discovered in May of 1982 (*id.* ¶ 21) that the defendants' products contained "high levels of asbestos" (*id.* ¶ 4), and that such condition presents

> ... a danger to the health and welfare of school children, teachers, and administrative and maintenance personnel, in that asbestos fiber causes numerous diseases, including mesothelioma, lung cancer, asbestosis, and other diseases harmful to the body, lungs, respiratory system, skin, and health of said persons. ... [*Id.* ¶ 7.]

incurred to fulfill all parties' *tort duties* to the true 'consumers' of the products.") (emphasis in original).

1. All defendants (except Davis Speake & Associates) have joined in a supplemental motion to dismiss filed by defendant United States Gypsum Company, contending this action was "improperly instituted in the name of the wrong party...." (See the "Supplemental Memorandum of Law of United States Gypsum Company in Support of Motion for Dismissal, For Summary Judgment or, in the Alternative, for Judgment on the Pleadings" filed March 12, 1984.) Specifically, U.S. Gypsum contends that *Ala.Code* § 16–11–12 (1975) mandates that actions such as this one be commenced in the name of the city, rather than in the name of the city board of education.

   The Huntsville City Board of Education responded to that motion on April 13, 1984 by filing a "Motion for Joinder of [the City of Huntsville, Alabama as a party plaintiff] Under Rules 15, 17, 21, and 24." U.S. Gypsum then filed a "Motion in Opposition to Plaintiff's Motion for Joinder of Party..." on April 27, 1984.

   Oral argument on the foregoing has not been conducted, and no ruling has been rendered by this Court. Consequently, throughout this opinion the "plaintiff" shall be referred to in the singular form, or as "the School Board."

2. *I.e.*, National Gypsum Company, United States Gypsum Company, W.R. Grace Company, Owens–Illinois, Inc., and Owens–Corning Fiberglas Corp. (Of this group, Owens–Illinois, Inc. was dismissed on June 7, 1984 in response to a joint motion and stipulation for dismissal.) The remaining defendant, Davis Speake & Associates, was the architect for some of the construction projects.

3. Plaintiff filed an amended complaint on August 22, 1983. All paragraph references in this opinion are to that document.

Therefore, the Board asserts, it "must remove and abate said asbestos products, and replace furniture, carpeting and other items in the school[s]. . . ." (*Id.* ¶ 8.)

While the exact costs of labor and materials occasioned by such work are not presently known (since the effort is ongoing), the Board estimates it will exceed $2,000,000. The Board also contends the removal procedures will cause "various consequential expenses," flowing from "serious disruptions in the operation" of the public school programs as work is performed and, "the investment of considerable time by administrative personnel." (*Id.*) The Board claims the aggregate amount of $15,000,000 in "actual and punitive damages" for all of such alleged harm, and any equitable relief this Court deems appropriate.

The original complaint was bottomed upon nine legal theories: *i.e.*, (1) restitution; (2) negligence; (3) strict liability in tort; (4) the "Alabama Extended Manufacturer's Liability Doctrine"; (5) breach of implied warranties; (6) breach of express warranties; (7) fraud and misrepresentation; (8) conspiracy; and (9) unfair trade practices. On August 22, 1983, however, the Board filed an amended complaint which deleted those four claims based upon the theories of strict liability in tort, breach of express and implied warranties, and unfair trade practices.[4] The remainder of this opinion shall consider the defendants' various motions directed to the complaint as thus amended.[5]

## II. NEGLIGENCE AND THE ALABAMA EXTENDED MANUFACTURER'S LIABILITY DOCTRINE

The third and fourth claims of plaintiff's amended complaint are based upon the theories of negligence and the "Alabama Extended Manufacturer's Liability Doctrine," respectively. Defendants raise several arguments in opposition to those tort claims, but the main thrust of their attack is centered on the notion that damages for "economic losses" are not recoverable under either theory. "Plaintiff's remedy in a

4. Plaintiff has attempted to bootleg these theories back into the case. Plaintiff attached "[a] copy of the complaint as it shall be set forth in the future, if this motion is granted," to its "Motion for Joinder of Party Under Rules 15, 17, 21 and 24." That attachment alleges claims premised upon the same nine theories of the original complaint.

5. Those motions are as follows:

(a) *NATIONAL GYPSUM COMPANY:*
(i) Motion to Dismiss or, in the Alternative, Motion for Judgment on the Pleadings or Summary Judgment (filed May 31, 1983); and
(ii) Alternative Motion to Dismiss the Amended Complaint, for Judgment on the Pleadings or for Summary Judgment (filed September 2, 1983).

(b) *UNITED STATES GYPSUM COMPANY:* Motion to Dismiss the Amended Complaint, or in the Alternative, Motion for Judgment on the Pleadings, or for Summary Judgment, or for Joinder or Substitution of the Real Party in Interest, or for a Change of Venue, or for Joinder of an Indispensable Party (filed September 8, 1983).

(c) *W.R. GRACE COMPANY:* Motion for Judgment on the Pleadings (filed June 1, 1983).

(d) *OWENS–CORNING FIBERGLAS CORPORATION:* Motion for Judgment on the Pleadings (filed June 1, 1983).

(e) *OWENS–ILLINOIS, INC.:* All motions by this defendant are moot, in view of this Court's Order of Dismissal rendered June 7, 1984 (see footnote 2, *supra*).

(f) *DAVIS SPEAKE & ASSOCIATES:* Motion for Summary Judgment (filed February 10, 1984, and again February 14, 1984). However, by agreement of counsel (see letters dated March 22, 1984 and April 5, 1984), this defendant has agreed that plaintiff need not respond to this motion "until at least 30 days after" this Court rules upon the motions described above.

case such as this one would properly be in a timely contract action for breach of warranty." (*National Gypsum Co. Brief* 37.)

Generally speaking, defendants can claim the support of at least three distinguished commentators for their positions. For example, the late Dean William Prosser wrote:

> There can be no doubt that the seller's liability for *negligence* covers any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself, as where an automobile is wrecked by reason of its own bad brakes, as well as damage to any other property in the vicinity. *But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule, to be encountered later, that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery.*

W. Prosser, *The Law of Torts* § 101 (4th ed.1971) (emphasis added). *See also,* Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 *Minn. L.Rev.* 791, 822–823 (1966); White & Summers, *Handbook of the Law Under the Uniform Commercial Code* § 11–5 (1972).

More recently, and closer to home, the Deans of Alabama's two, major law schools have said:

> Both the manufacturer and retailer may sustain liability for the plaintiff's injuries proximately resulting from their negligence. The plaintiff's damages would be those recoverable in any negligence suit—pain and suffering, medical expenses, lost wages, loss of consortium as well as consequential injury to other property.
>
> *Neither the manufacturer nor the retailer, however, is liable in tort to the purchaser for a defective product only. A defective product is a loss of the benefit of the bargain which is a contract rather than a tort action.* Negligence and other tort actions have as their public policy the protection of person and property, other than the purchased product. The product itself, therefore, falls outside the protected ambit, but the plaintiff has an action in contract for total or partial failure of consideration or a breach of an express or implied warranty.

C. Gamble & D. Corley, *Alabama Law of Damages* § 32–8 (1982) (emphasis added). In a subsequent section of the same text (*id.,* at § 32–17), Deans Gamble and Corley add the following:

> The companion decisions which gave birth to Alabama's Extended Manufacturer's Liability Doctrine (AEMLD) make it fairly clear that the plaintiff may recover damages for proximately caused injury to himself or his property. Section 402A of the Restatement (second) of Torts, upon which AEMLD was based, subjects the defendant to liability for physical harm caused to the plaintiff or to his property.
>
> *An abiding and open issue is whether the plaintiff may recover under AEMLD for purely economic loss to the product in question* such as down time or loss of use. There is considerable national authority for the proposition that *402A is not addressed to cases of mere pecuniary loss,* but is limited to cases where there is "physical harm" or "property damage." [Emphasis added.]

In spite of such impressive authority, the question of whether "economic losses"[1] can be recovered under the tort theo-

---

**1.** The definitions of the terms "personal injury," "property damage," and "economic loss-es" that will be observed throughout this opinion are set-out *infra,* at pages 1250–52.

ries of negligence, strict liability, or the Alabama Extended Manufacturer's Liability Doctrine is not capable of easy resolution. The answer lies in the field of divided opinion. As Deans Gamble and Corley imply in the last excerpt from their text, the debate is far from being closed. In order to see more clearly the direction in which the law may be headed, therefore, it may be helpful to trace from whence it has come. Such an exercise must be undertaken with some caution, however, because clarity of hindsight does not ensure an equally acute vision of the future. As Holmes once said in a related context:

> The law [of torts] did not begin with a theory. It has never worked one out. The point from which it started and that at which ... it has arrived, are on different planes. In the progress from one to the other, it is to be expected that its course should not be straight and its direction not always visible. All that can be done is to point out a tendency, and to justify it.

O.W. Holmes, Jr., *The Common Law* 77–78 (1881).[2]

## (A) *A SHORT HISTORY OF LIABILITY FOR DEFECTIVE PRODUCTS*

### (1) *The Law Through Greenman v. Yuba Power Products*

It has been well said that "[t]he law of products liability has a long and interesting history."[3] As interesting as that history may be, a detailed account of it will not aid in the solution of the present question.[4] Rather, for present purposes, only a brief look at the positions which the concepts of a "warranty" and "strict liability" have occupied in that development will be useful.

Prior to 1916, manufacturers generally were immune from liability under any theory of recovery to persons who did not have a direct sales or contractual relationship with them. The so-called doctrine of "privity" required that a plaintiff and defendant stand in a direct contractual relationship before the plaintiff could recover for injuries inflicted by products manufactured by the defendant. This rule insulated most manufacturers because the American practice of marketing products through independent wholesalers and retailers precluded the existence of privity between the manufacturer and the ultimate consumer.

The reasons for judicial insistence upon proof of "privity" as a prerequisite for recovery in the early products liability cases—especially those based upon the tort of negligence[5]—are not altogether

---

**2.** *See also*, Holmes, *Codes, and the Arrangement of the Law*, 5 Am.L.Rev. 1 (1870): "It is the merit of the common law that it decides the case first and determines the principle afterwards."

**3.** Donovan, *Recent Development in Products Liability Litigation in New England: The Emerging Confrontation Between the Expanding Law of Torts and the Uniform Commercial Code*, 19 Maine L.Rev. 181 (1967) (hereinafter cited as *The Emerging Confrontation* ).

**4.** In any event, the products liability revolution has been extensively reported by distinguished commentators. See *e.g.*, Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099 (1960) (hereinaf-

ter, *The Assault* ); Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L.Rev. 791 (1966) (hereinafter, *The Fall* ). *See also*, Edmeades, *The Citadel Stands: The Recovery of Economic Loss in American Products Liability*, 27 Case W. Res. L.Rev. 647 (1977) (hereinafter, *The Citadel Stands* ).

**5.** The common law requirement that a plaintiff had to be in privity of contract with the defendant in order to maintain an action grounded *either* in negligence *or* breach of warranty is illustrated by the old English cases of *Winterbottom v. Wright*, 152 Eng.Rep. 402, 405 (Ex. 1842), and, *Longmeid v. Holliday*, 155 Eng.Rep. 752, 754–755 (Ex. 1851).

clear. But it probably was more attributable to the "favored status contemporary society accorded manufacturing in its infancy"[6] than to any judicial misinterpretation of Lord Abinger's sweeping dictum in the case of *Winterbottom v. Wright.*[7] As one interpreter has noted,

> Protection against suits by consumers along the distributive chain was felt essential for two basic reasons. First, it was thought that businessmen could not foresee injury to remote vendees. Second, there was the fear that extension of liability would result in a multiplicity of costly claims which would inhibit industrial development.
>
> Application of this restrictive rule of non-liability yielded many harsh results. It soon became apparent that a more equitable method for spreading the loss among financially responsible parties was needed. Accordingly, the courts were impelled to engraft a series of exceptions on the privity doctrine. Where food or drink was involved the courts recognized a special responsibility of purveyors, and eliminated the requirements of privity in negligence actions. Other exceptions soon followed. However, the most important exception, the one eventually leading to the demise of privity in negligence actions for personal injury and property damage, involved

the marketing of articles "imminently" or "inherently" dangerous to human action. Finally, with Judge Cardozo's famous decision in 1916 in *MacPherson v. Buick Motor Co.*, the exceptions swallowed up the rule. It quickly became settled law that a manufacturer who placed a product on the market reasonably certain to imperil life and limb if improperly made owed a duty to the consumer to use diligence. "If he is negligent, where danger is to be foreseen, a liability will follow." The opinion made it clear that privity had no place in the law of negligence:

> We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law.

Donovan, *The Emerging Confrontation, supra* note 3 at 184–185 (footnotes omitted).

The *MacPherson* case[8] is a benchmark in this field of the law. It established the rule that a manufacturer can be held liable to foreseeable users for personal injury without proof of privity *if,* through negligence in the manufacturing process, the defendant created a dangerous product. "If the nature of a thing is such that it is

**6.** Donovan, *The Emerging Confrontation* 184. *See also,* Gregory, *Trespass to Negligence to Absolute Liability,* 37 *Virginia L.Rev.* 359 (1951), and, White, *The Intellectual Origins of Torts in America* 86 *Yale L.J.* 671 (1977). Both Gregory and White explore the analogous development of the law of negligence as "a *limiting* principle of tort liability." White, *supra* at 686 (emphasis added). Gregory concludes that "a consistent theory of liability based on fault [*i.e.,* negligence] was developed to confer on industrial enterprise an immunity from liability for accidental harm to others." Gregory, *supra* at 382. In like manner, it is probable that the concept of privity was employed for much the same reasons: "to make risk-creating enterprise less hazardous to investors and entrepreneurs than it had been previously at common law." *Id.* 368.

**7.** *Supra* note 5. Dean Prosser laid the blame for the privity requirement upon "error [in the] interpretation of" *Winterbottom,* a case he colorfully described as "a fishbone in the throat of the law." W. Prosser, *The Law of Torts* § 96 (4th ed.1971).

**8.** *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916).

reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger," and liability follows.[9]

The *MacPherson* doctrine won wide acceptance. It soon became settled law in almost every jurisdiction.[10] As a result, plaintiffs injured by defective products had a choice of remedies: either an action in warranty (requiring proof of privity of contract), or the *MacPherson* negligence action (not requiring privity). Even so, neither remedy was entirely satisfactory as a vehicle for imposing liability. Both actions presented problems of proof which often prevented (but always frustrated) recovery. One court described the legal dilemma facing a typical plaintiff in a suit against a mass-producer of consumer products as follows:

> The warranty action, of ancient lineage, did not require a showing of negligence (through a showing of negligence, of course, did not defeat it) but it did require privity of contract. The negligence action, on the other hand, did not require privity but it did require that the plaintiff show a lack of due care with respect to the particular article, *e.g.*, the bottle of Coca Cola in the present case. *Either of these doctrines, literally applied, gave the manufacturer a virtual immunity.* As for privity, the injured consumer and the manufacturer were contractual strangers, unless related by a fiction. As for negligence, the annual output of such bottles often ran into the millions. To show the negligence of the manufacturer with respect to any particular bottle was an impossibility.

*Manzoni v. Detroit Coca–Cola Bottling Company*, 363 Mich. 235, 109 N.W.2d 918, 920 (1961) (emphasis added).[11]

Thus, while both theories presented evidentiary hurdles that were difficult to surmount, the negligence action was the most difficult to maintain. Often, it was (as the *Manzoni* decision stated) "an impossibility."

> Unfortunately, except in the most obvious instances of negligent conduct, it is difficult for the injured consumer to acquire adequate proof that it was the manufacturer, and not any of the intermediaries in the distributive chain, who was responsible for the defect in the product. In many cases, the injured consumer, who may be hospitalized and unable to earn a living, has neither the resources nor the knowledge to sustain the kind of investigative effort necessary to secure evidence sufficient to establish negligence on the part of the manufacturer. The problem of proof is further compounded by the unfortunate fact that in the milieu of modern manufacturing and marketing conditions, *defective products are quite often produced, inspected, and marketed in the absence of negligence on the part of anyone.*

Comment, *The Vexing Problem of the Purely Economic Loss in Products Liability: An Injury in Search of a Remedy*, 4 Seton–Hall L.Rev. 145, 147–148 (1972) (emphasis added) (hereinafter cited as "The Vexing Problem").

In an effort to circumvent the difficulties of the negligence action, therefore, artful attorneys and crafty courts turned back to the concept of "warranty." In doing so, however, they had to engage in considerable distortion of the concept.[12] To allow

---

9. *Id.* at 389, 111 N.E. at 1053.

10. Prosser, *The Assault, supra* note 4 at 1100–1102.

11. *See also, id.,* at 1114–1119, 1127–1134.

12. *See, e.g.,* Prosser, *The Assault, supra* note 4 at 1126–1127, where it is said that:

> The adoption of this particular device was facilitated by the peculiar and uncertain nature and character of warranty, a freak hybrid born of the illicit intercourse of tort and contract. "A more notable example of legal miscegenation could hardly be cited than that which produced the modern action for breach of warranty. Originally

recovery in cases involving physical injury, they restricted or eliminated the requirements of notice, privity of contract, and the right to disclaim liability.

> As observance of these aspects of the law of sales ... relaxed, the courts ... inevitably shifted their approach, in fact if not always in terminology, closer to the concept of strict liability.

sounding in tort, yet arising out of the warrantor's consent to be bound, it later ceased necessarily to be consensual, and at the same time came to lie mainly in contract."

The action for breach of warranty was originally one on the case, sounding in tort and closely allied to deceit, from which it was not distinguished; and it was not until 1778 that the contract action was held to lie at all. It is undisputed that the original tort form of action, as on the case, still survives to the present day, and may everywhere be maintained. Nor is this a mere technical matter of procedure, since there are many decisions which have held that the tort aspects of warranty permits the application of a tort rather than a contract rule, in such matters as the survival of actions, the statute of limitations, the measure of damages, or recovery for wrongful death. Beyond this, the old tort character has continued to color the substantive law of warranty itself, by perpetuating the idea of a misrepresentation of fact, however innocent, and of a liability arising and imposed by operation of law, which is quite independent of any intention to agree upon terms as a matter of fact. Thus there are a great many cases, even between the immediate parties, in which to say that the warranty is a term of the contract is "to speak the language of pure fiction."

The conclusion from all this is obvious. If warranty is a matter of tort as well as contract, and if it can arise without any intent to make it a matter of contract, then it should need no contract; and it may arise and exist between parties who have not dealt with one another. Notwithstanding this ready-to-hand logic, however, the concept of warranty has involved so many major difficulties and disadvantages that it is very questionable whether it has not become rather a burden than a boon to the

Comment, *Seely v. White Motor Co.: Retrenchment in California on Strict Products Liability*, 52 *Virginia L.Rev.* 509, 513 (1966).

The trend of imposing liability without fault and without proof of privity under the rubric of "implied warranty" began in the field of food and drink.[13] During the 1950s, courts extended the trend to articles designed for intimate bodily use, such as hair dye, soap, and permanent wave solutions.[14] Once breached, however, the walls

courts in what they are trying to accomplish.

13. *Id.*, at 1103–1110. Alabama was a notable exception. Alabama "rejected the strict liability, and continue[d] to hold that the seller of food is not liable to the consumer in the absence of negligence or privity of contract." *Id.* 1108 (and cases there cited). *See also*, Titus, *Restatement (Second) of Torts Section 402A and the Uniform Commercial Code*, 22 *Stan.L.Rev.* 713, 742 & n.158 (1970) (hereinafter cited as *§ 402A and the UCC* ).

14. *Id.* 1110–1112. Again, Alabama was an exception. It should be noted, however, that in addition to those cases which were imposing strict liability in tort upon manufacturers of certain items under the label of "implied warranty," there was another theory which *de facto* imposed strict liability under a so-called "express warranty." *See, e.g., Baxter v. Ford Motor Co.*, 168 Wash. 456, 12 P.2d 409, *aff'd per curiam on rehearing*, 168 Wash. 456, 15 P.2d 1118 (1932), *aff'd on second appeal*, 179 Wash. 123, 35 P.2d 1090 (1934). In *Baxter*, the Washington Supreme Court held that a statement contained in the advertising literature distributed by an automobile manufacturer (that the windshield glass was "shatterproof") made it liable, without proof of fault, to the plaintiff who was injured when a pebble struck the glass and shattered it. Prosser deemed the *Baxter* decision to be the "first major recognition of strict liability...." Prosser, *The Assault* 1135. Cases which have followed the *Baxter* "express warranty" theory have held a manufacturer liable to purchasers who relied upon advertisements or other mass representations about product quality, and who sustained personal injuries as a result of product defects at variance with such representations. *See, e.g., Randy Knitwear, Inc. v. American Cyanamid Co.*, 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399

of the citadel of privity began to crumble on every front. The food/intimate bodily use cases were followed by decisions which appeared to impose strict liability upon manufacturers of mechanical and industrial goods, albeit under the label of "implied warranty."[15] The landmark decision in this progression was *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960).

Of all the decisions against manufacturers which attack privity and appear to take the step from food to mechanical products, none has the untainted basis of *Henningsen.*

Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 *Minn. L.Rev.* 791, 792n.4 (1966).

The plaintiff in *Henningsen* sued in implied warranty for personal injuries she suffered when a car manufactured by defendant Chrysler Corporation, and given to her by her husband (who had purchased the automobile from Bloomfield Motors), made an unscheduled turn into a very solid, brick wall. The New Jersey Supreme Court, stressing "justice to the con-

---

(1962); *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 147 N.E.2d 612 (1958).

**15.** Dean Prosser was among the first to recognize the long-range implications of the so-called "implied warranty" decisions. Writing about this trend in 1960, Prosser hailed

> *seven spectacular decisions*, which appear to have thrown the limitation to food onto the ash pile, and to hold that the seller of *any product* who sells it in *a condition dangerous for use* is *strictly liable* to its ultimate user for *injuries* resulting from such use, although the seller has exercised all possible care, and the user has entered into no contractual relation with him.

Prosser, *The Assault, supra* note 4 at 1112–1114 (emphasis supplied), referring to: *B.F. Goodrich Co. v. Hammond*, 269 F.2d 501 (10th Cir.1959); *Peterson v. Lamb Rubber Co.*, 343 P.2d 261 (Cal.App.1959); *Hinton v. Republic Aviation Corp.*, 180 F.Supp. 31 (S.D.N.Y.1959); *Beck v. Spindler*, 256 Minn. 543, 99 N.W.2d 670 (1959); *Jarnot v. Ford Motor Co.*, 191 Pa.Super. 422, 156 A.2d 568 (1959); *Continental Copper & Steel Indus., Inc. v. E.C. "Red" Cornelius, Inc.*, 104 So.2d 40 (Fla.Dist.Ct.App.1958); and, *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120, 90 N.W.2d 873 (1958).

According to Prosser, "the real break to other products," which signaled the advent of strict liability in tort as a theory for the imposition of liability,

> came in 1958 with *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, where the Michigan court found a warranty, without

privity and without negligence, of cinder building blocks *when the user's home collapsed.*

W. Prosser, *Handbook of the Law of Torts* § 97, at 654 (4th ed.1971) (emphasis added).

However, Prosser completely misread the *Spence* case. The structure involved was *not* the user's "home," and it did *not* collapse. Rather, cinder blocks which had been used to construct a lakeside cabin started to crack, chip, and pit "into a popping series of *minute* craters" (*Spence, supra* at 122, 90 N.W.2d at 874). There *was* expert testimony to the effect that such defects were progressive and would "at some undefined future time probably endanger the structure" (*id.* at 126, 90 N.W.2d at 876), but there certainly was no dramatic structural failure as reported by Prosser. *Most importantly, the loss for which recovery was allowed was "economic"!*

Presser's misreading of the *Spence* case was not limited to that decision. As one commentator later observed, of the "seven spectacular decisions" hailed by Prosser,

> only three of them [*B.F. Goodrich, Peterson*, and *Hinton* ] were concerned with personal injury. Of the others, three [*Continental Copper, Spence*, and *Beck* ], and possibly four [*Jarnot* ], *were awards for economic loss.*

Edmeades, *The Citadel Stands, supra* note 4 at 665 (emphasis supplied.)

The importance of all this is, of course, obvious: *the doctrine of strict liability in tort had its gestative stirrings in cases involving the recovery of "economic losses."*

sumer," upheld the plaintiff's action without proof of negligence, and invalidated the defendant-manufacturer's disclaimer because of its unfair, and unbargained-for, quality. *Henningsen v. Bloomfield Motors, Inc., supra* at 404, 161 A.2d at 95. In effect, the court held that, as a matter of law, an implied warranty of fitness attached to every product placed in the stream of commerce, and flowed from the manufacturer to the foreseeable user, regardless of privity or fault.[16]

The use of "implied warranty" as a label to describe the liability imposed, however, was misleading at best. For, indeed, the *Henningsen* "warranty" was not a product of contract. Rather, it was imposed by law for policy reasons, and existed between parties who had no contractual relationship. Furthermore, it was beyond the power of the parties who *did* make the contract to modify the effect of the implied warranty by specific agreement. In essence, therefore, the *Henningsen* concept of an implied warranty action without proof of privity was more an artifice for imposing liability than a description of contractual reality. In actuality, it was a fiction, and the court was "legislating." In all but name, the New Jersey Supreme Court had created a new tort. As we shall presently see, the name of the new action was supplied by California.

Throughout this long (and if you will pardon the pun) torturous judicial process of gradually eliminating the restrictive aspects of contract concepts in the field of products liability, some clear-headed individuals plainly saw what the courts really were about, and called for frankness. One such voice in the wilderness was Professor Charles O. Gregory of the Yale Law School, who concluded a magnificent essay with the following cry:

> [I]n the field of civil liability our courts are undermining the old fault principles, little by little, in a manner which leaves many of us puzzled and confused about the present state of the law. Why should not the courts either adhere to the clear-cut legal principles of Shaw's day, leaving any departure from them to the legislatures, or cut clean away from them with open acknowledgment of a

---

16.

> We see no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automobile. The unwholesome beverage may bring illness to one person, the defective car, with its great potentiality for harm to the driver, occupants, and others, demands even less adherence to the narrow barrier of privity.
>
> \* \* \*
>
> Under modern conditions the ordinary layman, on responding to the importuning of colorful advertising, has neither the opportunity nor the capacity to inspect or to determine the fitness of an automobile for use; he must rely on the manufacturer who has control of its construction, and to some degree on the dealer who, to the limited extent called for by the manufacturer's instructions, inspects and services it before delivery. In such a marketing milieu his

> remedies and those of persons who properly claim through him should not depend "upon the intricacies of the law of sales. The obligation of the manufacturer should not be based alone on privity of contract. It should rest as was once said, upon 'the demands of social justice.' " ....
>
> ... Accordingly, we hold that under modern marketing conditions, when a manufacturer puts a new automobile in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable for use as such accompanies it into the hands of the ultimate purchaser. Absence of agency between the manufacturer and the dealer who makes the ultimate sale is immaterial.

*Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69, 83–84 (1960). *See also*, Prosser, *The Fall, supra* note 4 at 792–794; Donovan, *The Emerging Controntation, supra* note 3 at 187–189.

modern theory of absolute liability without fault, bereft of all the moldy trappings of the ancient common law, if they are going to effect the change anyway, without benefit of legislation? Whether such a new theory should acknowledge absolute liability only for the consequences of extrahazardous conduct or should take the form of an outright enterprise liability analogous to that reflected in the Workmen's Compensation Acts is a matter "which wiser heads in time may settle." At least, the courage and wisdom of a Shaw in our times might tell us where we stand, and why, in a manner which would make the teaching and study of the law of torts— let alone its practice and administration—a far different thing from the venture into confusion it now presents.

Gregory, *Trespass to Negligence to Absolute Liability*, 37 *Virginia L.Rev.* 359, 396–397 (1951).[17]

Possibly in response to that call, Justice (later Chief Justice) Traynor of the California Supreme Court struck a blow for candor in the case of *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963). In *Greenman,* a consumer brought an action for personal injuries against the manufacturer of a defective power tool. The California Supreme Court held that the plaintiff's failure to give the manufacturer notice of the alleged breach of warranty within a reasonable time as required by California's version of the Uniform Sales Act (the predecessor of the UCC) was not a bar to the action. Abandoning "implied warranty" as the label under which recovery would be allowed when a defective product caused physical injury, Traynor declared that henceforth the true name for such actions would be "strict liability in tort." While recognizing that cases such as *Henningsen* had reached substantially the same result under the guise of implied warranty principles, Traynor advocated the clear adoption of "strict liability in tort" in order to demonstrate that consumer remedies did not rest solely on contract theory.

[R]ules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by

---

**17.** In the same vein, Prosser advocated that the sheep's clothing of contract concepts be stripped from the wolf of torts, and that the courts should forthrightly declare "what they [were] really doing." [Footnote 17 continued on next page.]

All this is pernicious and entirely unnecessary. No one doubts that, unless there is privity, liability to the consumer must be in tort and not in contract. There is no need to borrow a concept from the contract law of sales; and it is "only by some violent pounding and twisting" that "warranty" can be made to serve the purpose at all. Why talk of it? If there is to be strict liability in tort, let there be strict liability in tort, declared outright, without an illusory contract mask. Such strict liability is familiar enough in the law of animals, abnormally dangerous activities, nuisance, workmen's compensation, and respondeat superior. There is nothing so shocking about it today that cannot be accepted and stand on its own feet in this new and additional field, provided always that public sentiment, public demand, and "public policy" have reached the point where the change is called form. There are not lacking indications that some of the courts are about ready to throw away the crutch, and to admit what they are really doing, when they say that the warranty is not the one made on the original sale, and does not run with the goods, but is a new and independent one made directly to the consumer, and that it does not arise out of or depend upon any contract, but is imposed by the law, in tort, as a matter of policy. Prosser, *The Assault* 1134.

their defective products unless those rules also serve the purposes for which such liability is imposed.

... The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best.... It should not be controlling whether the details of the sales from manufacturer to retailer and from retailer to plaintiff's wife were such that one or more of the implied warranties of the sales act arose.... "The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales." ... To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use.

*Greenman v. Yuba Power Products, Inc.,* *supra* at 63, 27 Cal.Rptr. at 701, 377 P.2d at 901.

There is compelling force in Justice Traynor's basic thesis that noncommercial, personal injury losses caused by defective products are more appropriately handled under a tort theory than under the rubric of warranty principles.

Given the task of providing an effective remedy for the injured consumer or ultimate user of a defective product, the court rejected traditional warranty theory as ill-suited for the "purpose." Stated in the most basic terms, the court made the value judgment that the strict liability doctrine would produce fewer unjust and anomalous results.

Note, 7 *B.C. Indus. & Com.L.Rev.* 767, 769 (1966). In addition, there is an attractive simplicity and straightforward quality to Traynor's argument in *Greenman.* Yet, it is that very articular simplicity that became so troublesome because it glossed over some very significant questions and *caveats.* As one commentator observed afterwards,[18]

once the courts tore loose from the semblance of contract liability, they openly entered the arena of potential conflict with the [Uniform Commercial] Code and its handling of sales transactions. The never-ending need for judicial development and elaboration of principles shows *Greenman* to be both the end of one sequence and the beginning of a new one.

(2) *The Law After Greenman: Restatement § 402A, Santor, and Seely*

The year following Justice Traynor's decision in *Greenman,* Dean Prosser (who served as Reporter for the *Restatement (Second) of Torts* ) persuaded the American Law Institute to adopt the following as Section 402A of the new text.[19]

**18.** Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective–Product Cases,* 18 *Stan.L.Rev.* 974, 992 (1966) (hereinafter cited as *When Worlds Collide* ). *See also,* Titus, *§ 402A and the UCC, supra* note 13 at 720–728. *But see,* Prosser, *The Fall* 804–805:

It would be easy, however, to overestimate the significance of the change, which is more one of theory than of substance. It is only the rules of contract which have been jettisoned, where there is no contract. The substance of the seller's undertaking

remains unaffected; and as Chief Justice Traynor himself has agreed, the precedents of the "warranty" cases will still determine what he must deliver. They will determine also the extent of his liability, except in so far as limitations derived from the law of contract have been applied. No case has been overthrown unless it has applied such a contract limitation.

**19.** It is of interest to note that Justice Traynor "served as one of the advisers to the *Restatement (Second) of Torts.*" Titus, *§ 402A and*

**§ 402A.** *Special Liability of Sellers of Products for Physical Harm to User or Consumer*

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property, is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

As thus formulated by *Greenman* and its progeny, *Restatement (Second)* § 402A, the action for strict liability in tort was originally limited to cases involving personal injuries. But it eventually was extended to cases involving physical damage to property other than the defective product itself. The only question remaining, therefore, was the issue which confronts this court: should strict liability (or its Alabama variant) be extended to the situation in which a plaintiff suffers only "economic loss"? Before addressing that issue, however, one needs to be sure that he understands what the courts mean when they speak of "economic losses."

Generally speaking, a defective product can cause three kinds of harm: (1) *personal injuries;* (2) *property damage;* or (3) *economic loss.* The first type, if not self-evident, is easily delineated. It denotes any harm or damage to the health of a person, however caused (whether by accident, disease, or otherwise), and encompasses physical pain, illness, disfigurement, or loss of the function of any bodily member or organ. The last two categories are not so easily distinguished from one another, however. Both courts and commentators have experienced difficulty in defining just what kinds of harm should be inserted into the "property damage" and "economic loss" pigeonholes. The purpose of the following sub-sections, therefore, is to state the definitions of those terms that shall be observed throughout this opinion.

(a) *Definition of "property damage":*

As used in this opinion, the term "property damage" refers to *physical harm* "that a defective product has caused to tangible property *other than itself.*" Franklin, *When Worlds Collide, supra* note 18 at 981 (emphasis added). Usually, this occurs when the product-defect causes an *accident* "involving some violence or collision with external objects." *Fentress*

---

*the UCC* 720. It also is of interest to note that:

> In 1961 William Prosser first introduced a draft of section 402A of the *Restatement (Second) of Torts* to the American Law Institute. The 1961 version of this rule of strict tort liability was limited to sales of "food." In 1962 the American Law Institute adopted a revision of section 402A in which strict tort liability was extended beyond food to products for "intimate bodily use." Two years later Dean Prosser, the Reporter

> for the new *Restatement,* asked the Institute to withdraw the 1962 version in favor of a new draft of section 402A extending strict tort liability to "any product." Mr. Prosser explained that he had withheld the 1962 version of section 402A from the printers "because of the rather spectacular developments in the case law on the subject." In response to its Reporter's urgings, the American Law Institute adopted the new text of section 402A.

*Id.* 713.

*v. Van Etta Motors*, 157 Cal.App.2d Supp. 863, 866, 323 P.2d 227, 229 (Super.Ct.App.Dep't 1958). Thus, for an example,

> operation of a defective radiator causes property damage when it results in a fire which destroys the plaintiff's store and economic harm when it results in conditions so uncomfortable that it causes the loss of customer patronage.

Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966).[20]

Nonetheless, "violence or collision with external objects" is not the *sine qua non* for distinguishing "property damage" from "economic loss." Property damage may result from *non*-violent occurrences which result in physical harm to property other than the defective product itself. For example, consider the following situation: suppose the defendant manufactures a glue which it sells to plaintiff, and plaintiff uses the glue to cement rubber soles to leather shoe uppers. In this fact situation,

> a failure of the paste to properly adhere causes economic loss if it does not physically damage the shoes but merely renders them unsaleable; on the other hand, a defect in the paste which physically damages the shoe causes property loss.

*Id. See also, Karl's Shoe Stores, Ltd. v. United Shoe Machinery Corporation*, 145 F.Supp. 376 (D.Mass.1956) (case brief is found in Appendix II, *infra* ).

(b) *Definition of "economic loss"*:

It would seem to follow by way of elimination, therefore, that "economic loss" includes every kind of damage that results from deterioration, internal breakage, or other non-accidental causes *not harmful* to persons or other property. In a facile sense, that is true. However, the label is much too broad to be of much use in drawing the fine distinctions that sometimes must be made in order to make sense of the decided cases. The term "economic loss" requires further refinement. To begin with, "economic losses" may be divided into two basic categories: direct and indirect (or consequential).

In a general sense, the term *"direct economic losses "* refers to *out-of-pocket expenditures* by the plaintiff. More specifically, it encompasses the following situations:

> (i) *Repair or Replacement Loss: i.e.,* this refers to the costs incurred in repairing the defective product, or in replacing a defective product that cannot be repaired; or

> (ii) *Loss of Bargain: i.e.,* this refers to the diminution in the value of the defective product as measured by *either* the difference between the purchase price of the product and its salvage value in its damaged condition, *or* the difference between the value of the product to plaintiff had it been as represented by the seller and its actual fair market value in its defective condition (*e.g., Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965)).

*Consequential economic losses,* on the other hand, include all *indirect* losses sustained by a plaintiff. "Most often these consequential damages are business losses an owner incurs when he is deprived of the

---

**20.** *See, Star Furniture Co. v. Pulaski Furniture Co.,* 171 W.Va. 79, 297 S.E.2d 854 (1982) In that case, plaintiff had purchased a "curio clock" for display and retail sale in his furniture store. A defect in the clock's wiring caused a fire which substantially damaged plaintiff's building and inventory. Plaintiff was allowed to recover for "property damage" under strict liability, but *not* for "consequential economic loss such as lost profits." (Case brief is found in Appendix I, *infra.*)

product's use." *Mead Corp. v. Allendale Mutual Insurance Co.,* 465 F.Supp. 355, 363 (N.D.Ohio 1979).

Typical elements of consequential loss include expected profit on resale, anticipated profits lost because of the purchaser's inability to make use of the defective chattel in his business, and legal liability incurred in reliance on the representation.

Note, *Economic Loss in Products Liability Jurisprudence, supra* at 934. Thus, some commentators have referred to consequential economic losses as "expectation losses": "for example, loss of use of the product in business or, perhaps, loss of a valuable deal." Franklin, *When Worlds Collide, supra* note 18 at 981. Nonetheless, such losses may be incurred outside a business context.

An example of such a loss would be a loss of wages suffered by an owner of a defective automobile who cannot procure substitute transportation to get to work.

Comment, *The Vexing Problem, supra* at 155.

To summarize, therefore, a defective product can cause the following categories of harm:

(1) PERSONAL INJURIES;

(2) PROPERTY DAMAGE (defined as physical harm or damage to tangible property other than the defective product itself);

(3) DIRECT ECONOMIC LOSSES (which may be further subdivided into repair and replacement losses, or loss of the benefit of the bargain); and

(4) CONSEQUENTIAL ECONOMIC LOSSES.

(c) *The opening volley: Santor v. A & M Karagheusian*

The first case following *Greerman v. Yuba Power Products* to address the question of whether "economic losses" were recoverable under a strict tort liability theory was *Santor v. A and M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), and it answered the query in the affirmative.

*Santor* involved a suit by an ordinary consumer against a remote manufacturer of defective carpeting. Plaintiff had purchased a quantity of the defendant-manufacturer's nationally advertised carpeting from a local retail dealer for installation in his home. The retailer specified that the carpeting was "Grade # 1." Soon after installation, the carpet developed an unsightly line. The retail dealer said it would "walk out." As the pile wore down, however, the line become worse, and, two additional lines appeared. These defects apparently rendered the carpeting useless to plaintiff from an *aesthetic* standpoint, but they were not dangerous to life or limb. Plaintiff ultimately became so fed-up that he decided to sue. But, by that time, the local retail dealer had gone out of business and had left the state. Consequently, plaintiff sued the intermediate wholesaler and the remote manufacturer for breach of an implied warranty of merchantability to recover for his direct "loss of bargain" economic loss, as measured by the purchase price he had paid for the carpeting. The manufacturer conceded at trial that the carpeting had been defectively manufactured, but nonetheless defended on the ground that plaintiff was barred from recovery by the privity rule. Karagheusian contended that privity of contract was still required where the defectively manufactured product was not dangerous, or was not likely to cause personal injury to the ultimate user or consumer. The trial court rejected that contention, and allowed plaintiff to recover. The intermediate appellate court reversed. On further appeal, however, the New Jersey Supreme Court reversed again, and reinstated the trial court judgment.

In reaching that result, the New Jersey Supreme Court acknowledged that "the great mass of warranty cases imposing liability on the manufacturer regardless of lack of privity"—including its own decision in *Henningsen v. Bloomfield Motors*— "were concerned with personal injuries to the consumer" (207 A.2d at 308), because of "the greater appeal of the personal injury claim." (*Id.* at 309.) Nonetheless, the court saw no reason why the remedy of implied warranty should be "fenced in by such a factor." (*Id.*) The court stated that application of the "age-old privity doctrine" so as to restrict the consumer to suit against only his immediate vendor, and thereby "to bar direct recourse to the manufacturer," would only promote "an unduly wasteful process of litigation." *Id.* at 310, *quoting with approval, Randy Knitwear, Inc. v. American Cyanamid Company*, 11 N.Y.2d 5, 226 N.Y.S.2d 363, 368, 181 N.E.2d 399, 403 (1962). The court saw "no just cause" for holding that a plaintiff who had sustained personal injuries or property damage could sue the manufacturer directly for breach of

> an implied warranty of merchantability ... regardless of lack of privity of the claimant in the one case *and the exclusion of recovery in the other simply because loss of value of the article sold is the only damage resulting from the breach.*
>
> The manufacturer is the father of the transaction. He makes the article and puts it in the channels of trade for sale to the public.... The dealer is simply a way station, a conduit on its trip from manufacturer to consumer. For these reasons in the recent past the courts of many jurisdictions, in an endeavor to achieve justice for the ultimate consumer, have imposed an implied warranty of reasonable fitness on the person responsible for the existence of the article and

the origin of the marketing process. *From the standpoint of principle, we perceive no sound reason why the implication of reasonable fitness should be attached to the transaction and be actionable against the manufacturer where the defectively-made product has caused personal injury, and not actionable when inadequate manufacture has put a worthless article in the hands of an innocent purchaser who has paid the required price for it.* In such situations considerations of justice require a court to interest itself in originating causes and to apply the principle of implied warranty on that basis, *rather than to test its application by whether personal injury or simply loss of bargain resulted from the breach of the warranty ....*

> It should make no difference that the defect in the product did not or was not likely to cause harm to the purchaser ....

*Santor v. A and M Karagheusian, Inc., supra* at 59, 207 A.2d at 309 (emphasis added).

If the *Santor* opinion had stopped right there, the case probably would have caused no great stir. After all, the concept of allowing the recovery of "economic losses" within the context of a *contract* action was not unknown in the law. However, the New Jersey Supreme Court went further—much further, in fact. In an entirely separate portion of its opinion, the court added by way of *dictum* that use of the term "implied warranty" to describe the plaintiff's remedy was merely using "a convenient legal device or formalism" to implement the desired public policy of the court. The remedy *ought to be* "cast in simpler form" said the courts, and the plaintiff *ought to be* able to achieve the same result *via* the action for strict liability in tort. Defining the manufacturer's obligation as what "in justice it ought to

be—an enterprise liability ... which should not depend upon the intricacies of the law of sales," the court defined the tort duty of the manufacturer as a duty to avoid producing commodities that are "defective, *i.e.*, not reasonably fit for the ordinary purposes for which such articles are sold and used...." *Id.* at 66–67, 207 A.2d at 312.

It seems important to observe, however, that the *manufacturer's liability may be cast in simpler form.*

As was noted in *Henningsen*, in seeking justice for ultimate consumers the courts were hard put to find legal mechanisms to overcome the strictures of the long-standing privity of contract requirement.... We chose at that time to measure the manufacturer's responsibility under modern marketing conditions by an implied warranty of reasonable suitability of the article manufactured for the use for which it was reasonably intended to be sold....

It must be said that in the present-day marketing milieu, treatment of the manufacturer's liability to ultimate purchasers or consumers in terms of implied warranty is simply using a convenient legal device or formalism to accomplish the purpose.... The fact is that as a matter of public policy the law has imposed on manufacturers a duty to such persons irrespective of contract or a privity relationship between them. Such concept expressed in terms of breach of implied warranty of fitness or mechantability bespeaks a *sui generis* cause of action. Its character is hybrid, having its commencement in contract and its termination in tort....

In this developing field of the law, courts have necessarily been proceeding step by step in their search for a stable principle which can stand on its own base as a permanent part of the substantive law. The quest has found sound expression, we believe, in the doctrine of strict liability in tort.... As we indicated in *Henningsen*, the great mass of the purchasing public has neither adequate knowledge nor sufficient opportunity to determine if articles bought or used are defective.... It must be said, therefore, that when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. As the Supreme Court of California said, such representation must be regarded as implicit in their presence on the market.... The obligation of the manufacturer thus becomes what in justice it ought to be—an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves....

\*    \*    \*    \*    \*    \*

And, although the doctrine has been applied principally in connection with personal injuries sustained by expected users from defective products which are dangerous when defective, we reiterate ... that the responsibility of the maker should be no different where damage to the article sold or other property of the consumer is involved.

*Santor v. A and M Karagheusian, Inc., supra* at 63–66, 207 A.2d at 311–312.

(d) *The shot strikes a vital part of the Citadel's fortifications, and panic spreads*

It is fair to say that, when news of *Santor*'s alternate holding got around, all hell broke loose. The quite state in which legal theorists had been lulled by the articulate simplicity and pleasing symmetry of Justice Traynor's reasoning in *Greenman* was abruptly shattered. Judges, lawyers, and legal commentators all belatedly awoke to the realization of fundamental conflicts between strict tort doctrine and the law of sales. Some charged that, by holding the strict liability doctrine applicable to *all* products liability cases, the *Santor* court had totally displaced the Uniform Commercial Code's warranty rules by judicial fiat. The following remarks are representative of the criticism that erupted:

> It is striking that those who would use tort law to protect consumers in defective-product cases do so with only the most cursory explicit recognition that there may already be a body of law directed toward regulating the rights of buyers and sellers, and a statutory body at that. The courts are operating at the border of an area considered by draftsmen at great length and framed in legislation arguably relevant to the cases before the courts. Yet, these judges appear either unaware of the merging of the tort and sales lines or else unwilling to consider the possible limitations legislation may impose on traditional judicial primacy in tort law. Apparent unawareness was exhibited in the carpet case, where the court noted that development of warranty law to protect plaintiffs "had its gestative stirrings because of the greater appeal of the personal injury claim. But, once in existence, the field of operation of the remedy should not be fenced in by such a factor." The court builds from a traditional tort base to the edge of sales— and perhaps beyond—without recognition of possible conflict.

> The unwillingness of particular judges who see the relevance of sales law to ponder seriously this possible limit on judicial freedom is even more remarkable....

> At best, we have judicial lack of awareness of the possible relevance of sales law. At worst, we have open judicial defiance of apparent statutory commands. The area is on the verge of becoming a battleground and warrants full investigation before matters get worse. The pertinent questions are what areas the statutory sales law has entered and what the appropriate impact of this entry should be in products liability cases.

Franklin, *When Worlds Collide, supra* note 18 at 989–990.[21] Indeed, it did seem

---

**21.** *See also, e.g.,* Shanker, *Strict Tort Theory of Products Liability and the Uniform Commercial Code: A Commentary on Jurisprudential Eclipses, Pigeonholes and Communications Barriers,* 17 *W.Res.L.Rev.* 5 (1965); Note, 79 *Harv.L.Rev.* 1315, 1318–1319 (1966) ("contract doctrine might well be more appropriate in terms of theory when loss of the bargain is claimed"). *But see, e.g.,* Littlefield, *Some Thoughts on Products Liability Law: A Reply to Professor Shanker,* 18 *W.Res.L.Rev.* 10 (1966) (*i.e.*, a reply to Professor Shanker's charge that the courts which were adopting strict liability in tort were improperly ignoring the UCC's rules on warranties). For a review of the Shanker–Littlefield debate, see Donovan, *The Emerging Confrontation* at 251–257.

The passage of time did not cause the criticism to abate. For example, one commentator, writing seven years later, stated that *Santor* and the cases which followed it had "cast grave doubts as to the continued viability of these statutory rights and have, in effect, undermined the authority of the Code in" those jurisdictions that adopted the reasoning of *Santor.* Comment, *The Vexing Problem of the Purely Economic Loss in Products Liability: An Injury in Search of a Remedy,* 4 *Seton Hall L.Rev.* 145, 174 (1972).

Manufacturers in these states can no longer rely upon the disclaimers, notice provi-

to be (as one writer remarked some years later, when the smoke from the fusillade had cleared),

> a topsy-turvey world when a rule of law based upon a statute must be changed in order to conform with a rule of common law, but one must expect such things when the "storming" courts "ascend over the corpses of the slain" in their assault upon the citadel.

Titus, § 402A and the UCC, supra note 13, at 717. See also, Speidel, Product Liability, Economic Loss and the UCC, 40 Tenn. L.Rev. 309 (1973).

(e) Retrenchment and return fire: Seely v. White Motor Co.

In the teeth of such criticism, it is ironically appropriate that the second case following Greenman which had occasion to consider the question of whether economic losses were recoverable under a strict liability theory should be decided by the California Supreme Court. Barely four months after Santor, that court handed down its decision in Seely v. White Motor Company, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). Again, Traynor (who by then had become Chief Justice) spoke for the majority. And, like the New Jersey Supreme Court's opinion in Santor, Traynor's text in the Seely case had two parts: a strict holding and significant dicta. It was in dictum that Traynor acknowledged the looming conflict between the common law doctrine of strict liability in tort and the legislative pronouncement's of the Uniform Commercial Code; and, it was there that Traynor stated his rebuttal to the critics.

The facts which gave rise to the Seely case were these: the plaintiff had purchased a truck manufactured by White Motor Company for use in his heavy-duty hauling business. The sales contract contained an express warranty by the manufacturer that the truck was "free from defects in materials and workmanship under normal use and service," and that the manufacturer would make "good at its factory any part or parts" of the truck that proved defective. Very soon after taking possession of the truck, however, plaintiff discovered that it would bounce violently under load, an action called "galloping." For eleven months following the purchase, the retail dealer (with guidance from the manufacturer) tried unsuccessfully to eliminate the galloping. Those corrective efforts were cut short by a second, and apparently unrelated, problem.

> On July 22, 1960, when slowing down for a turn, plaintiff found that the brakes did not work. The truck overturned, and plaintiff, who was not personally injured, had the damage repaired for $5,466.09. In September 1960, after paying $11,659.44 of the purchase price of $22,041.76, plaintiff served notice that he would make no more payments. [The retail dealer] thereafter repossessed the truck and sold it for $13,000.

Seely v. White Motor Company, supra at 12, 45 Cal.Rptr. 17, 403 P.2d at 147 (emphasis added).

sions, and liability limitations of the Code to provide a dependable definition of their potential liability for direct economic losses. Instead, they are forced to look with uncertainty to the rather elastic and still developing law of strict liability. This can hardly be the result that the legislatures of [those states following Santor] had in mind when they adopted the Code, for among the Code's express purposes are "to simplify, clarify and modernize the law governing commercial transactions;" and the language of section 1–103 demonstrates legislative intent to displace common law in the area of commercial transactions that is inconsistent with the provisions of the Code.... [Id.]

Plaintiff then filed suit against both the retail dealer and the manufacturer. His complaint was based upon two theories of recovery: breach of an express warranty and strict liability in tort. He sought recovery of both "direct economic losses" (*i.e.*, the cost of repairing the damages resulting from the accident, and, the loss of the benefit of his bargain as measured by the amount he had paid on the purchase price of the truck) and "consequential economic losses" (*i.e.*, the profits he had lost in his business because he was unable to make normal use of the truck). The trial court awarded plaintiff a judgment against the manufacturer

> for $20,899.94, consisting of $11,659.44 for payments on the purchase price and $9,240.40 for lost profits. It found that plaintiff had not proved that the galloping caused the accident and therefore denied his claim for $5,466.09 for the repair of the truck. Both plaintiff and White appeal[ed] from the judgment.

*Id.* at 13, 45 Cal.Rptr. 17, 403 P.2d at 148. The Supreme Court of California affirmed, holding that "[t]he award was proper on the basis of a breach of express warranty." *Id.*

As previously noted, however, Chief Justice Traynor went beyond this strict holding. In extensive *dicta*, Traynor condemned *Santor*'s application of strict liability principles to a case involving only economic loss. In doing so, it appears that Traynor really was addressing his remarks to a wider audience: those critics who contended that strict liability in tort had usurped the Uniform Commercial Code. This supposition is supported by the manner in which Traynor began the *dictum* portion of the majority opinion:

> It is contended that the foregoing legislative scheme ·of recovery has been superseded by the doctrine of strict liability in tort set forth in *Greenman v.*

*Yuba Power Products, Inc.,* .... We cannot agree with this contention. *Id.* at 15, 45 Cal.Rptr. 17, 403 P.2d at 149.

Chief Justice Traynor then tried to explain why the common law remedy had not eclipsed the legislative rules for recovery. He did so by narrowly defining the kinds of damages to which the doctrine of strict liability applied: *i.e.*, it applied to *personal injuries* and *property damage* (because "[p]hysical injury to property is so akin to personal injury that there is no reason for distinguishing them" [45 Cal.Rptr. 17, 403 P.2d at 152] ), but *not* to *economic loses.* While it is just to demand of a manufacturer that his products not create unreasonable risks of harm to person and property, Traynor reasoned, it is going too far to hold a manufacturer strictly liable in tort when his product fails to meet a purchaser's particular economic expectations.

Chief Justice Traynor did not speak for a unanimous court. Justice Peters accepted the result of the majority opinion in *Seely,* but rejected its reasoning. In essence, Peters felt the majority was too concerned about the charge that strict liability in tort had superseded the UCC rules on implied warranties. "Of course," he stated,

> ... the application of the strict liability theory to property damage (including "economic loss") will limit the application of several sections of the recently enacted Commercial Code dealing with implied warranties.... But this result, even if unfortunate, follows from the rationale of Greenman....

*Id.* at 21, 45 Cal.Rptr. 17, 403 P.2d at 153 (Peters, J., concurring and dissenting).

Peters then explained that such a result—"even if unfortunate," as he said above—certainly was not a heresy in the law. To the contrary, it was "well established" that the damages awarded in so-called "personal injury" cases

may include compensation for past loss of time and earnings due to the injury ..., for loss of future earning capacity ..., and for increased living expenses caused by the injury.... There is no logical distinction between these losses and the losses suffered by plaintiff here. *All involve economic loss, and all proximately arise out of the purchase of a defective product.*

*Id.* (Emphasis added.)

On the other hand, Justice Peters acknowledged that he—like the *Seely* majority—did not want to extend the strict liability doctrine to the point that it would "*completely* deny *any* effect to the disclaimer and notice provisions of the Commercial Code." [45 Cal.Rptr. 17, 403 P.2d at 158 (emphasis supplied).] "Thus," Peters said, "*a line must be drawn somewhere.*" (*Id.*) But, *where?* That, of course, *is* the important question. According to Peters, the line should *not* be drawn long after the transaction has taken place, and according to the type of damages sustained. Such a line is "arbitrary and artificial," Peters said, because there is "no sound basis for distinguishing between the types of damage assigned to opposite sides of the majority's line." (*Id.*) Rather, Peters argued, the line should be drawn *at the time of the sale* of the product, and it should be drawn between "commercial" consumers and "ordinary" consumers.

The majority recognize that the rules governing warranties were developed to meet the needs of "commercial transactions." If this is so, then why not look to the *transaction* between the buyer and the seller and see if it was a "commercial" transaction rather than a sale to an ordinary consumer at the end of the marketing chain? How can the nature of the damages which occur *later,* long after the transaction has been completed, control the characterization of the transaction? Any line which determines whether damages should be covered by warranty law or the strict liability doctrine should be drawn at the time the sale is made.

\* \* \* \* \* \*

I am not concerned over the fact that if ["economic"] damages on the strict liability theory are allowed here, this may limit the application of some of the restrictive statutory provisions relating to warranty. In my opinion those restrictive provisions should not apply to the ordinary consumer, who is usually unable to protect himself from insidious contractual provisions such as disclaimers, foisted upon him by commercial enterprises whose bargaining power he is seldom able to match, *and* who is "seldom 'steeped in the business practice which justifies' " the notice requirement (*Greenman v. Yuba Power Products, Inc.,* supra, ...), *and* who should not be barred by the privity requirement.... The purpose of the strict liability rule adopted in Greenman was to protect people who are "powerless to protect themselves." .... This does not mean, however, that the implied warranty sections of the code should not apply *within* the world of commerce, where the parties generally bargain on a somewhat equal plane and may be presumed to be familiar with the legal problems involved when defective goods are purchased.

*Seely v. White Motor Company, supra* at 26–27, 45 Cal.Rptr. 17, 403 P.2d at 156–157 (Peters, Jr., concurring and dissenting) (emphasis in original).

Thus, the trenches of battle were dug. And until just recently, all ensuing litigation occurred principally within the tricornered field described by *Santor, Seely,* and Justice Peters' position.

### (3) *Beyond Santor and Seely: The Ebb and Flow of Battle*

The conflicting principles set forth in *Santor* and *Seely* concerning recovery of "economic losses" under strict liability principles have been adjudicated in numerous jurisdictions during the intervening years. Most of the relevant cases have been cited in the plaintiff's, or in the defendants', briefs. An initial reading of those cases, however, did not disclose either a clear trend of authority, or an underlying rhyme or reason tying the various results together. Rather, the impression gained by this court upon first reading was one of utter confusion. Myriad artificial distinctions between recoverable and non-recoverable damages were discussed, and cited as the basis for decision.

Consequently, in an effort to, at least, discover the direction in which the tide of verbal battle is moving (if not to discern the logical force behind such movement), this court re-read, and briefed, all of the cases cited by any of the parties, as well as a number of other decisions turned up in independent research. Moreover, in an effort to ensure that comparables were compared, each case was briefed in accordance with a common format of relevant questions. Ninety decisions from thirty-three jurisdictions were thus digested. The fruits of this labor are reproduced in Appendices I, II, and III (and the results summarized in Appendix IV). Although at least one surprising result was gleaned, the harvest of labor was not altogether satisfying.

The "surprise" was finding that, contrary to popular opinion, a majority of *jurisdictions* (as opposed to *cases*) have allowed the recovery of economic losses in tort actions. As summarized in Table No. 1 (Appendix IV), thirteen states have *clearly allowed* the recovery of such losses under the tort theories of negligence or strict liability, or both. In contrast, only eight states have *clearly denied* the recovery of economic losses under the *same* theories. Twelve other jurisdictions (with cases on both sides of the issue) initially were categorized as "questionable." After carefully reviewing the rationale(s) underlying the cases from those jurisdictions, however, a judicious estimate was made about the "tendency" of each state on the question confronted by this court. But even when such "tendencies" are taken into account, the trend is not reversed: a clear majority of the states (20 *vs.* 13) either have allowed, or probably would allow, recovery of economic losses under the theories of negligence or strict liability, or both.

Thus, the general movement of the law appears to be in favor of plaintiff's position. Nonetheless, the policy underlying that trend is not altogether clear. In their search for an appropriate resolution of the tort-contract conflict, the courts have grasped at a wide variety of legal devices and rationales. No consensus of opinion commanding universal allegiance has yet emerged. Obviously, the courts still are groping for firm ground in the doctrinal quagmire lying between the rock of torts and the hard place of contract. With apologies to T.S. Eliot, the flood of words that has poured from the courts and their law review "explicators" in recent years seems, to this writer (after hundreds of midnight hours of reading, re-reading, and still more reading), to

> ... strain,
> Crack and sometimes break, under the burden,
> Under the tension, slip, slide, perish,
> Decay with imprecision, will not stay in place,
> Will not stay still. Shrieking voices
> Scolding, mocking, or merely chattering,
> Always assail them. . . .

T.S. Eliot, "Burnt Norton" 149–155, *Four Quartets* (1935). The following sub-sections, therefore, must be seen—even after all this time and effort—as only an endeavor to impose some order upon the disarray of a still pitched battle.

### (a) The "anything goes" approach

Beginning at one extreme end of the spectrum of opinions, one finds a minority of courts which allow the recovery of economic losses in negligence or strict liability in all cases where the product defect causes the product to become useless. In these cases, it is irrelevant how the product incurred the harm; it only is significant that the product was defective, did not perform adequately, and as a proximate result the consumer incurred loss—economic or otherwise. This essentially was the position of the New Jersey Supreme Court in *Santor*.[22] It also was the position of the Michigan Court of Appeals in *Cova v. Harley Davidson Motor Co.*,[23] of

**22.**
Under the strict liability in tort doctrine, as in the case of express or implied warranty of fitness or merchantability, proof of manufacturer's negligence in the making or handling of the article is not required. If the article is defective, i.e., not reasonably fit for the ordinary purposes for which such articles are sold and used, and the defect arose out of the design or manufacture, or while the article was in the control of the manufacturer, and it proximately causes injury or damage to the ultimate purchaser or reasonably expected consumer, liability exists.
*Santor v. A and M Karagheusian, Inc., supra* at 66–67, 207 A.2d at 312–313.
*See also,* Comment, *The Vexing Problem,* 4 *Seton Hall L.Rev.* at 176, where that author states: "*Santor* supports the proposition that it is unconscionable for a large manufacturer to disclaim liability for a direct economic loss suffered by an ordinary remote consumer."

**23.** 26 Mich.App. 602, 182 N.W.2d 800 (Ct. App.1970). In *Cova,* the plaintiffs (doing business as "Bob–O–Link Golf Course") purchased golf carts manufactured by the defendant. The carts simply failed to function properly, and plaintiffs sued for direct (cost of repairs) and consequential (lost profits from cart rentals) economic losses. The court allowed recovery under strict liability principles (see case brief in Appendix III).
*Cova* extends *Santor* further, standing for the proposition that it is also unconscionable for a large manufacturer to disclaim liability for a direct economic loss suffered by a small commercial consumer. Conversely, *Seely* and all of the other cases which have explicitly denied recovery in strict liability for direct economic losses, support the proposition that it is not unconscionable for a large manufacturer to disclaim or severely limit liability for a direct economic loss suffered by a commercial consumer, irrespective of his size.

   \*    \*    \*    \*    \*    \*

There is a basic distinction between the *Cova* and *Santor* fact situations. *Cova* involved a claim by a small commercial consumer who suffered both direct and consequential economic losses, while *Santor* involved a claim by a small ordinary consumer who suffered only a direct economic loss. Both cases permitted recovery for direct economic losses, reasoning that recovery in strict liability should not depend upon the type of injury suffered. *Santor* did not consider the question of whether a distinction should be made on the basis of the type of plaintiff, but directed itself solely to the question of whether strict liability should be limited to personal injury cases.
[A]lthough the doctrine has been applied principally in connection with personal injuries sustained by expected users from products which are dangerous when defective ... the responsibility of the maker should be no different where damage to the article sold or to other property of the consumer is involved.
The *Cova* court also did not appear to be concerned with the type of plaintiff insofar as the claim for direct economic loss was concerned, but it did hint that recovery for a consequential economic loss might depend upon the type of plaintiff involved.
If damages for loss of profits are awarded it will be soon enough to consider whether there should be limitations on the kinds of plaintiffs who will be permitted to recover consequential damages....
In this respect, *Cova* appears to agree with Justice Peters' contention in his concurring and dissenting opinion in *Seely:*

the Washington Supreme Court in *Berg v. General Motors Corporation,*[24] and of the Oregon Supreme Court in *State ex rel. Western Seed Production Corp. v. Campbell.*[25]

(b) *The "nature of the damage" approach*

Lying at the opposite end of the spectrum are those courts which make the

outcome of a case turn upon *the nature of the damages* sustained by the plaintiff. Sometimes referred to as the "type of harm test,"[26] it was the test applied by the California Supreme Court in *Seely,*[27] after rejecting New Jersey's approach in *Santor.* It is a simplistic approach, and has been criticized as such.[28] Nonetheless, it

> What *is* important is not the nature of the damage but the relative roles played by the parties to the purchase contract and the nature of their transaction.
>
> Unlike Justice Peters, however, the *Cova* court did not indicate that where the plaintiff is a commercial consumer, recovery in strict liability for a consequential economic loss should depend solely upon the relative bargaining positions of the parties. Despite the fact that both parties were engaged in commercial enterprises in *Seely,* Justice Peters concluded that plaintiff should be entitled to recover in strict liability for his consequential economic loss solely upon the basis of plaintiff's inferior bargaining position.

Comment, *The Vexing Problem,* 4 *Seton Hall L.Rev.* at 176–178.

**24.** 87 Wash.2d 584, 555 P.2d 818 (1976). In *Berg,* the plaintiff purchased a diesel engine for his commercial fishing boat. The engine malfunctioned and plaintiff sought to recover his business losses (which were primarily consequential lost profits). The court allowed recovery in negligence (see Appendix III).

**25.** 250 Or. 262, 442 P.2d 215 (1968), *cert.denied,* 393 U.S. 1093, 89 S.Ct. 862, 21 L.Ed.2d 784 (1969). In the *Western Seed* case, the plaintiffs were sugar beet growers who sought recovery of consequential lost profits from a seed supplier who had sold defective seeds, resulting in a "worthless crop." The court allowed recovery in negligence (see Appendix II).

**26.** *E.g.,* Franklin, *When Worlds Collide, supra* at 980.

**27.** It will be recalled that, in *Seely,*
> ... plaintiff was permitted to recover under strict tort liability for physical damage to his truck incurred when the truck's brakes failed. In the ensuing accident, the only injuries were to the truck itself. The court stated that there existed no logical distinc-

tion between the physical damage to property and personal injury. Therefore, both types of harm should be actionable in tort. The court distinguished these types of harm from those sought by the plaintiff in a second claim against the defendant manufacturer: prior to the accident the truck had "bounced violently" in operation, causing the plaintiff to lose profits and incur expenses in attempting to correct the bouncing problem. The court held that this type of harm would not be actionable in tort on the theory that a manufacturer cannot be held to the level of performance required of his products in plaintiff's business unless the manufacturer agrees that the product was designed to meet the consumer's demands. Justice Traynor feared limitless extension of a manufacturer's liability if the result were otherwise:

> If under these circumstances defendant is strictly liable in tort for the commercial loss suffered by plaintiff, then it would be liable for business losses of other truckers caused by the failure of its trucks to meet the specific needs of their business, even though those needs were communicated only to the dealer.

Note, 43 *U.Pitt.L.Rev.* 1181, 1198–1199 (1982).

**28.** Professor Franklin, for one, has contended that the type-of-harm test is "difficult to handle" because "various types of harm are often jumbled in the same case, creating a major problem for Traynor's analysis." For example,

> [s]uppose the plaintiff buys a light airplane for business from a company selling such planes. The engine, made by a remote defendant, is defective. While the plaintiff is on a business trip, the defect, not demonstrably due to negligence, causes a crash in which there is only minor personal injury but in which the plane is demolished. A

has its adherents, and it has been the basis for decision in a number of cases. An extreme, if not "classic," example is *Hawkins Construction Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 643 (1973). In that case, the plaintiff had purchased "Waco HI–LOAD" steel scaffolding and shoring equipment to support the roof deck of a commercial building upon which concrete was to be layered. As the wet cement was being poured, the scaffolding gave way without warning, and the roof collapsed. Three workmen were in the vicinity. Two were not hurt at all; but a third, who fell with the roof twenty feet to the ground and who had "cement and debris come down on top of him ... miraculously escaped with only minor injuries." (209 N.W.2d at 648). In spite of the clear dangers to life and limb presented by such a defective product, and in spite of the fact that some of the damages for which plaintiff sought recovery were collateral damages to property other than to the defective product itself, the Nebraska Supreme Court blithely characterized the damages as "merely economic," and denied recovery under strict liability. Plaintiff's remedy, it said, lay in contract, for breach of express or implied warranties. (See Appendix I.) Other examples of the application of the "type-of-harm" test—although not as extreme as *Hawkins*—include the decision of the Georgia Court of Appeals in *Chrysler Corp. v. Taylor*,[29] and the Illinois Court of Appeals in *Alfred N. Koplin & Co. v. Chrysler Corp.*[30]

(c) *The "consumer" test*

In between these extreme ends of the spectrum fall several other "tests," or modes of analysis. For example, some cases seem to turn upon *the nature of the plaintiff*, as first suggested by Justice Peters in his concurring and dissenting opinion in *Seely*. This approach has been referred to as the "consumer" test.[31] The theory behind this test is that the Uniform Commercial Code, while admittedly applicable to consumer transactions, is nonetheless primarily designed to regular "commercial transactions": *i.e.*, situations in

---

tort action in California against the engine maker might present difficulty.... First, Traynor might say that since the personal injury action would lie in tort, the plaintiff could include the repair loss of the plane and any expectation loss. Or perhaps Traynor would separate the losses, allowing recovery for the personal injury in tort, the rest being left to conventional sales law. Perhaps he would use a form of gravamen test, so that the major dollar item for recovery would control the entire suit. Finally, he might define the "product" so as to include only the engine. This would mean the defective engine did "physical property damage" to the air-plane for which tort liability would lie. The plaintiff might then need sales law only to recover for the engine itself and perhaps any expectation loss. Franklin, *When Worlds Collide, supra* at 982.

**29.** 141 Ga.App. 671, 234 S.E.2d 123 (Ct.App. 1977). In the *Taylor* case, plaintiff purchased a new Dodge automobile. The car had numerous operating defects that never were repaired adequately. Plaintiff sued in negligence and strict liability seeking damages for loss of the benefit of the bargain, the cost of a replacement for the defective Dodge, interest paid on the auto, wages lost while arranging for repairs, and attorney fees. Recovery was denied in tort for such economic losses. (See Appendix II.)

**30.** 49 Ill.App.3d 194, 7 Ill.Dec. 113, 364 N.E.2d 100 (Ct.App.1977). In the *Alfred N. Koplin* case, plaintiff purchased Chrysler air conditioning units which failed to operate within various periods of time following installation. The Illinois Court of Appeals denied recovery of the plaintiff's direct repair & replacement economic losses in both negligence and strict liability. (See Appendix I.)

**31.** Franklin, *When Worlds Collide, supra* at 988.

which the parties bargain at arm's length, from relatively equal bargaining positions. Hence, if the transaction is "commercial," the law of sales should apply. On the other hand, if the plaintiff is an ordinary "consumer" and (or probably more importantly) if there is evidence of inequality in the bargaining positions of the parties, then tort principles should be employed. Thus, for example, in *Iowa Electric Light & Power Co. v. Allis–Chalmers Manufacturing Co.*, 360 F.Supp. 25 (S.D.Iowa 1973), the U.S. District Court for the Southern District of Iowa (applying Iowa law) did not allow the plaintiff power company to recover direct and consequential economic losses from the manufacturer of a faulty transformer under the theories of negligence or strict liability. In denying recovery, the federal district court opined: "It may be that in a situation where there is inequality of bargaining position between the consumer and the manufacturer, the Iowa Court would allow such recovery." *Id.*, at 32. (See Appendix II for case brief.)

### (d) *The "how the harm occurred" test*

Another approach favored by several courts is a hybrid of the *Seely*, "type-of-harm" test. Unlike the *Seely* test, however, this approach does not turn upon how the resultant *damages* are classified. Rather, it pivots upon how the damages *occurred*. In such cases, one usually finds that the defective product damaged not just itself, but other tangible property of the plaintiff as well: *i.e.*, collateral "property damage" as defined hereinabove. That fact has led some commentators to describe this approach as the "property damage exception" to the rule against recovery of economic losses under a tort theory.[32] I believe such a label to be misleading, however, because the presence of collateral property damage really is not the point which determines the judgment in such cases. Moreover, as one author has aptly noted, "[i]f damage to other property is necessary, it can almost always be found."[33] Instead, such cases truly turn upon *how* the damages *occurred*. Their *ratio decidendi* is simply this: when the damages result from an "accident," some sudden or violent event, or some circumstance in which personal injuries easily could have occurred, then the courts should not deny recovery solely because the plaintiff was fortunate enough to escape the calamity with his life, and all limbs, intact.

This "how the harm occurred" approach is demonstrated by two cases decided by the Alaska Supreme Court: *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976); and, *Cloud v. Kit Manufacturing Company*, 563 P.2d 248 (Alaska 1977). In the first case, plaintiff had purchased a mobile home manufactured by defendant New Moon Homes, Inc. Within six months of the purchase, defects had developed which caused the unit to be unfit for habitation: *e.g.*, the roof leaked; wall panels buckled; the wiring short-circuited; the tub leaked; the furnace failed; doors would not close; and, as incredible as it may sound, the list goes on. Plaintiff sought recovery of direct, repair & replacement economic losses under a strict liability theory. But the Alaska Supreme

---

32. Comment, *Products Liability: Expanding the Property Damage Exception in Pure Economic Loss Cases*, 54 *Chi.-Kent L.Rev.* 963 (1978).

33. Ribstein, *Guidelines for Deciding Product Economic Loss Cases*, 29 Mercer L.Rev. 493, 499 (1978). This same author argues that "it is questionable whether economic loss can in fact be distinguished from property damage." *Id.* at 496, 497–499.

Court held that plaintiff could recover such losses only in an action for breach of warranty, express or implied. The court refused to extend the action of strict tort liability to cases where the damages occurred *gradually*, as a result of product deterioration.

One year later, however, the same court permitted recovery of economic losses in a case where the damages occurred *suddenly*, and violently. In *Cloud v. Kit Manufacturing Company, supra*, the plaintiff also had purchased a mobile home. Three months after purchase, plaintiff stored a roll of polyurethane foam rug padding (which had been supplied by the defendant manufacturer as a part of the "mobile home package") in the crawl space beneath the mobile home. The padding ignited, and the ensuing fire destroyed the trailer and all of its contents. Plaintiff sued the manufacturer under strict liability in tort. And the Alaska Supreme Court allowed the recovery. But in doing so, the Court verbally danced around the issue, and dubbed the entire loss "property damage."

> The primary problem which arises results from the attempt to distinguish between economic loss and direct property damage. *We recognize that the line between economic loss and direct property damage is not always easy to discern, particularly when the plaintiff is seeking compensation for loss of the product itself.* We cannot lay down an all inclusive rule to distinguish between the two categories; *however, we note that sudden and calamitous damage will almost always result in direct property damage and that deterioration, internal breakage and depreciation will be considered economic loss.* In their attempts to distinguish between direct property damage and economic loss, the courts should be guided by the existence of, and underlying purposes for, the Uni-

form Commercial Code warranty actions.

> Turning then to the circumstances alleged in the Clouds' complaint, *we must determine whether any part of their claimed harm was economic loss.* We note, first, that the damage to the product, the trailer package, was the result of a sudden and calamitous occurrence, the fire. Accordingly, we hold that the damage to the product in this case was direct property damage. The damage alleged in the complaint to the Clouds' personal belongings, furniture, apparel and jewelry is direct damage to their personal property and thus is compensable if proven to be attributable to a defect in the produce as manufactured by Kit Manufacturing. *We note that the harm alleged in this case is much different from that alleged by the Morrows in New Moon.* The Morrows' trailer was allegedly defectively manufactured, but the defects resulted in a deprivation of the value of the Morrows' bargain. Unlike the circumstances in the case at bar, the Morrows were plagued by a "lemon," not an unsafe product. The Morrows' trailer was not suited for the purpose for which it was purchased, but the defects in it were not such that they resulted in sudden, violent or calamitous harm. Having been deprived of the intended use of their product, the harm in that case was properly classified as economic loss.

*Cloud v. Kit Manufacturing Co., supra* at 251 (emphasis added).

The foregoing excerpt from the *Cloud* opinion is, at best, misleading. The court can *call* the Clouds' loss "property damage" and can try to shove the case into that pigeonhole. But it will not fit. There just is no getting around the *fact* that the primary loss sustained by plaintiffs was *economic: i.e.,* the replacement cost of the

mobile home. Admittedly, there was collateral property damage, but the loss of clothing and furnishings was not the most significant aspect of the plaintiffs' damages. Allowing recovery on that basis alone is somewhat akin to allowing the factual "tail" to wag the legal "dog." Moreover, and importantly, if one closely reads the *New Moon Homes* case, he will find that the Morrows also sustained collateral property damage to their personal property as a result of water blowing into the trailer through leaks in the roof and cracks in the wall; yet, recovery was not allowed in that case under a tort theory. Hence, the Alaska Supreme Court is playing semantic games. They are dealing in legal fictions. They are calling the loss non-recoverable "economic loss" in the first instance and recoverable "property damage" in the second—but what they *really* are concerned about is *how the damage occurred!*

### (e) *The "dangerous-nondangerous" distinction*

The final approach followed by some courts as a means of separating cases that may be adjudicated on tort principles from those that must be decided by the UCC rules on warranties has been named the "dangerous-nondangerous distinction." Ribstein, *Guidelines for Deciding Product Economic Loss Cases, supra* at 500. This approach is a recent addition to the battle of words, but it has much to offer from a conceptual standpoint. It actually is a logical extension of the "how the harm occurred" test, as is demonstrated by yet a third Alaskan case [*Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324 (Alaska 1981) ], and another based upon Pennsylvania law [*Pennsylvania Glass Sand Corporation v. Caterpillar Tractor Company*, 652 F.2d 1165 (3rd Cir.1981) ]. It is merely coincidence

that Caterpillar Tractor Company was common to both.

In the first mentioned decision, Northern Power & Engineering Corp. purchased a diesel powered electrical generator manufactured by Caterpillar Tractor Co. Four or five years after the purchase, the generator's oil pressure shut-down mechanism failed, which caused the diesel engine to seize when oil pressure dropped to a point insufficient to lubricate the moving parts of the machine. This resulted in severe damage to the machine itself, but it caused no additional injury to persons or other property. Northern Power sued Caterpillar to recover both direct (repair & replacement) and consequential (loss of use) economic losses. Its claims in this regard were premised upon, *inter alia*, strict liability in tort. The trial court granted summary judgment in favor of Caterpillar, and Northern Power appealed. The Supreme Court of Alaska affirmed. In doing so, however, that court took a step away from its decisions in *New Moon Homes* and *Cloud, supra.* Without question, the harm in this case had occurred "suddenly" and "accidentally"; but that was not deemed the important point. Moreover, there was no collateral damage to property other than the defective product itself; but, again, that was not made the point for decision. Instead, the Alaska Supreme Court focused upon the fact that this damage—even though "severe"—never endangered persons or other property.

*There is nothing magical about the phrase "sudden and calamitous." Our purpose in using that phrase [in Cloud v. Kit Manufacturing ] was merely to illustrate those instances in which "property damage" is most likely to be found and, in so doing, to draw the line between those injuries which properly find their remedy in tort and those which are*

more appropriately governed by contract principles.

Contract law has been traditionally concerned with the fulfillment of reasonable economic expectations. *Tort law, on the other hand, is concerned with the safety of products and the corresponding quantum of care required of a manufacturer.* By distinguishing between sudden and calamitous injury on the one hand and less dramatic forms of injury on the other, *Cloud* draws the line between products which simply do not live up to their economic expectations and those which, although they did not break down in a manner which proved hazardous to persons or to other property, *could foreseeably have done so.* This distinction was explained in a recent Oregon case, *Russell v. Ford Motor Co.,* 281 Or. 587, 575 P.2d 1383, 1386–87 (Or. 1978): "* * * * *It is the distinction between the disappointed users ... and the endangered ones ...."

The distinction between dangerous and nondangerous products was at the heart of *Fentress v. Van Etta Motors,* 157 Cal.App.2d Supp. 863 323 P.2d 227 (1958), the case from which the "sudden and calamitous" language was originally drawn.

\* \* \* \* \* \*

We hold, therefore, that *when a defective product creates a situation potentially dangerous to persons or other property, and loss occurs as a result of that danger, strict liability in tort is an appropriate theory of recovery, even though the damage is confined to the product itself.* In order to recover on such a theory plaintiff must show (1) that the loss was a proximate result of the dangerous defect and (2) that the loss occurred under the kind of circumstances that made the product a basis for strict liability.

*Northern Power & Engineering Corp. v. Caterpillar Tractor Co., supra* at 328–329 (emphasis added). *See also, Shooshanian v. Wagner,* 672 P.2d 455 (Alaska 1983) (in which the Alaska Supreme Court reversed a trial court's dismissal of plaintiffs' strict liability claim for direct and consequential economic losses incurred in the removal of urea-formaldehyde foam insulation from the walls of a two-story, combination store and residence because the "toxicity" of the foam *endangered* the plaintiffs' health).

The *Pennsylvania Glass Sand* case clearly demonstrates how the "dangerous-nondangerous distinction" is evolving from the "how the harm occurred" test cases. In that case, plaintiff Pennsylvania Glass Sand Corporation (PGS) purchased a front-end loader from Caterpillar Tractor Co. PGS used the tractor heavily for about four years without incident. On the date in question, however, fire broke out in the engine of the tractor while it was in operation. The driver hastily abandoned the burning tractor, and did not shut the machine off before bailing out. As a result, flammable fluid from the tractor's hydraulic lines ignited and the conflagration quickly spread. The tractor was severely damaged. PGS incurred direct (repair and cost of temporary replacement) economic losses in the amount of $170,000. PGS sought recovery of these losses under a strict liability theory. The federal district court granted Caterpillar's motion for summary judgment on the ground that plaintiff's remedy lay in contract, but the Third Circuit Court of Appeals (applying Pennsylvania law) reversed. Even though that court talked much about the manner in which the harm had occurred, the *ratio decidendi* really lies in the distinction that can be drawn between disappointed users and endangered ones.

*The gist of a products liability tort case is not that the plaintiff failed to receive the quality of product he expected, but*

*that the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or his property.* On the other hand, contract law, *which protects expectation interests,* provides the appropriate set of rules when an individual wishes a product to perform a certain task in a certain way, or expects or desires a product of a particular quality so that it is fit for ordinary use.

Based on these policies, some courts have concluded that injuries that can be classified as economic loss should not be recoverable in tort. "Economic loss" has been defined as "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." Comment, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?* 114 U.Pa. L.Rev. 539, 541 (1966). This definition of economic loss accords with *the policy of warranty law to protect expectations of suitability and quality.* The items most frequently sought as damages for unsuitable products are the reduction in value caused by the defect, costs of repair or replacement, and loss of profits. *This does not mean, however, that every prayer for relief that seeks the costs of repairing a damaged product entails the type of economic loss traditionally encompassed within warranty law.* Commentators and several courts have carefully distinguished economic loss from physical harm or property damage. *The line that is drawn usually depends on the nature of the defect and the manner in which the damage occurred.* Defects of quality, evidenced by internal deterioration or breakdown, are assigned to the economic loss category, *while the loss stemming from de-fects that cause accidents "of violence or collision with external objects is treated as physical injury."* Tort law traditionally has redressed injuries properly classified as physical harm.

*Pennsylvania Glass Sand Corporation v. Caterpillar Tractor Company, supra* at 1169–1170 (emphasis added) (footnotes omitted). See also, *id.* at 1172–1173, where the court adds:

Several principles and trends may be distilled from this analysis of policy and the decisions of other courts. Although strict liability in tort developed out of the law of warranties, the courts of most states have recognized that the principles of warranty law remain the appropriate vehicle to redress a purchaser's disappointed expectations when a defect renders a product inferior or unable adequately to perform its intended function. . . . These courts have classified the damages consequent to qualitative defects, such as reduced value, return of purchase price, repair and replacement, or lost profits, as economic loss, and have relegated those who suffer such commercial loss to the remedies of contract law.

On the other hand, almost all courts have adopted the view that the benefit-of-the-bargain approach of warranty law is ill-suited to correct problems of *hazardous products* that cause physical injury. Manufacturers are better able to bear the risk or to take action to correct *flaws that pose a danger. Accordingly, tort law imposes a duty on manufacturers to produce safe items, regardless of whether the ultimate impact of the hazard in on people, other property, or the product itself.*

In cases such as the present one where only the defective product is damaged, the majority approach is to identify whether a particular injury amounts

to economic loss or physical damage. *In drawing this distinction, the items for which damages are sought, such as repair costs, are not determinative.* Rather, the line between tort and contract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. *These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to a particular claim.*

The bottom line on the *Pennsylvania Glass Sand* case is that the defective product "constitute[d] a safety hazard that posed a serious risk of harm to people and property" and, consequently, the Third Circuit Court of Appeals decided that:

Pennsylvania law would not treat the damage in this case as economic loss recoverable solely in a warranty action. Rather, we believe that Pennsylvania courts would regard the injury stemming from the allegedly hazardous defect in the loader as the sort of physical injury to property compensable under tort law.

*Id.* at 1174–1175.

## B. *ALABAMA'S PLACE IN THIS HISTORICAL PROGRESSION*

This tracing of the historical development of products liability law from the time of *Winterbottom* to the present inevitably leads to two questions: "Where does Alabama fit in this progression?" *and* "How would this case be decided by the Alabama Supreme Court?" The answer to the former question is "seemingly, not very well," and to the latter probably is, "in favor of plaintiff." Explanations are obviously in order.

### (1) *Products Liability in Alabama*

Throughout our history, Alabamians have prided themselves on the contributions we have made in times of war. We have given liberally of our resources—material, human, and intellectual—in all wars to protect, and extend, our democratic principles (including the war against Northern aggression). Alabamians always have been among the first to enlist, and in the vanguard of those who *attacked.* But none of that has been true of the legal battle waged against the citadel of privity. Rather, as Professor Julian McDonnell aptly remarked:

Few parapets of the citadel of privity have been more stoutly defended than that portion of the fort assigned to the protection of the Alabama judiciary. Courts and commentators across the nation have celebrated countless recoveries by injured consumers against manufacturers of defective products even in the absence of negligence or immediate contractual relations. But the Alabama Supreme Court has not been so inclined.

McDonnell, *The New Privity Puzzle: Products Liability Under Alabama's Uniform Commercial Code,* 22 Ala.L.Rev. 455 (1970). As but one example, Alabama even rejected the special "food warranty rule," based upon the commendable public policy of protecting human health and life against products presenting an exceptionally high risk of harm, and imposing liability without privity upon the manufacturer responsible for placing loathsome food and drink upon the market. *See,* Titus, *§ 402A and the UCC, supra* note 13 at 742 & n. 158. For another, we were more "restrained" than the majority of states in our application of the *MacPherson v. Buick Motor Co.* dangerous commodity principle—one of the basic weapons in the struggle to overcome privity—to Alabama fact situations. McDonnell, *supra* at 463.

*See also, e.g., Jefferson Standard Life Ins. Co. v. Watson,* 242 Ala. 181, 5 So.2d 639 (1942); Hare & Hare, *Principal Alabama Actions in Tort: Part II,* 22 Ala.L.Rev. 361, 377 (1970).

The reasons for the quiescence of the Alabama judiciary in *the* most significant legal battle of this century are not easily understood. Undoubtedly, they are complex. But, most likely they are (as Professor McDonnell conjectured):

> rooted in the types of products liability cases which have been presented to the Alabama court and in the arguably defensible assumptions with which Alabama jurists have approached the problem of injury-causing chattels. One of these assumptions has been that liability in these cases ought to be placed on [the] shoulders of the party who could be branded most at fault, the party who caused the product to be dangerous. A second assumption has been that avenues of recovery adequate for the protection of consumers could be developed within the confines of such a fault-oriented jurisprudence. And finally, there has been the inevitable Alabama allegiance to observing proper forms and procedures.

McDonnell, *supra* at 461.

In the opinion of this court, Professor McDonnell has correctly discerned the principal, *visible* keystones supporting the Alabama position on liability for defective products. The same themes he has identified appear over and over—in variegated forms and with varying emphasis—throughout the relevant cases. But those themes are nowhere more clearly in evidence than in the companion cases which purportedly rejected strict liability in tort as formulated by the California cases and *Restatement (Second)* § 402A, and which created the action known as the "Alabama extended manufacturer's liability doctrine": *i.e., Casrell v. Altec Industries, Inc.,* 335 So.2d 128 (Ala.1976), and *Atkins v. American Motors Corp.,* 335 So.2d 134 (Ala.1976). Thus, after reviewing the historical origins of the strict liability action, Justice Jones stated succinctly:

> While many may applaud the efforts of these courts to make the law more viable and responsive to the realities of modern society, in retrospect, our analysis of this progression causes us to take exception to two fundamental aspects of the Restatement's concept of strict liability:
>
> (1) the no-fault precept which imposes liability equally on all "sellers" without regard to culpability causally related in fact to the defective condition of the product, and
>
> (2) the practical abolition of the distinction between the remedies of tort and contract.

*Atkins v. American Motors Corp., supra* at 138. Based upon those *ostensible* premises, therefore, the Alabama Supreme Court adopted the principle of negligence *per se* as the proper approach.

We now extend the doctrine of "manufacturer's liability," and by definition this doctrine shall include not only the manufacturer, but also the supplier and the seller. We do not intend to impose a no-fault concept. On the other hand, we adhere to the tort concept of fault. Under the "extended manufacturer's liability doctrine," we opine that a manufacturer, or supplier, or seller, who markets a product not reasonably safe when supplied to its intended use in the usual and customary manner, constitutes negligence as a *matter of law.* As Dean Wade suggests, we hold scienter is supplied as a matter of law, and there is no need to prove its existence as matter of fact. In other words, the fault or negligence of the defendant is that he has conducted himself in a negligent manner

by placing a product on the market causing personal injury or property damage, when used to its intended purpose. As long as there is a causal relationship between the defendant's conduct and the defective product, he is held liable because he has created an unreasonable risk of harm. Liability—subject to allowable legal defenses—attaches solely because the defendants have exposed expected users of a product not reasonably safe to unreasonable risks. This is morally and legally correct.

*Casrell v. Altec Industries, Inc., supra* at 132 (Faulkner, J.) (emphasis in original). Mr. Justice Jones echoed Justice Faulkner's thoughts when, in *Atkins,* he explained that "the gravamen" of the new action

is that the defendant manufactured or designed or sold a defective product which, because of its unreasonably unsafe condition, injured the plaintiff or damaged his property when such product, substantially unaltered, was put to its intended use.

*Atkins v. American Motors Corp., supra* at 139.

One must pause, however, because none of this seems to make any sense. The Supreme Court plainly tells us—not just once, but twice, in two cases decided back to back—that they "do not intend to impose a no-fault concept" such as strict liability in tort. Then, in the very next breath, they tell us that the requisite fault is supplied "as a *matter of law*" whenever the plaintiff shows that he has been injured, or that his property has been damaged, by one who sold a product "in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer...." *Casrell* at 132 (Faulkner, J.); *Atkins* at 141 (Jones, J.). If that is true, then *what* in the world is the differ-

ence between strict liability in tort as formulated by *Restatement* § 402A and the Alabama action, other than the fact that the Court *says* they are different? When viewed from the perspective of *outcome,* or *result,* there really is no difference, as the Alabama Supreme Court acknowledged.

The historical and traditional purpose of tort law has been to protect persons against unreasonable risks. The only real difference between strict tort liability and the traditional negligence theory in products liability cases is that those courts which have adopted the rule of strict liability look to the dangerous characteristics of the end product, rather than the methods or processes by which it was produced. This represents a shift in emphasis from the manufacturer's, or seller's, conduct to the performance of his product. *However, the results are the same,* viz., the defendants must pay the consequences of placing an unreasonably dangerous or defective product on the market. If a product is unreasonably dangerous, it is necessarily defective, and the consumer should not be required to prove defectiveness as a separate matter.

*Casrell* at 131 (emphasis supplied); *Atkins* at 140–141 (same language repeated). When viewed from the perspective of *substantive* law, however, there is a difference between the *Restatement* doctrine and the Alabama hybrid. The Alabama doctrine affords defendants three affirmative defenses, two of which are not available under § 402A of the *Restatement: i.e.,* the "lack of causal relation defense," and contributory negligence. *See,* Note, 28 *Ala. L.Rev.* 747, 761–765 (1977). Nonetheless, this court submits that such is not the reason our Supreme Court fashioned the "extended manufacturer's liability doctrine."

Rather, this court submits that there are two reasons for the creation of an Alabama hybrid, and both are peculiar to the legal soil of this State. The first reason was addressed, albeit briefly, in both *Casrell* and *Atkins*. And it is related to the historical facts discussed by Professor McDonnell in his thoughtful article: namely, that in the last stages of our State's defense of the parapets of privity, the Supreme Court repeatedly insisted that any radical changes in doctrine were more properly a function of the legislature, rather than of the courts. McDonnell, *supra* at 461. Mr. Justice Faulkner touched fleetingly on this point when he stated:

> By extending the doctrine of manufacturer's liability, we are not invading the province of the Legislature. Developing case law is a proper role for this court, and that is what we are doing in this case.

*Casrell, supra* at 133. Mr. Justice Jones also addressed the point, but at more length; the following is the gist of his position.

> Before closing our discussion under this section of the opinion, we hasten to ease the minds of those who may feel that our holding here is a radical departure from established case law. It is not. A few observations respecting our cases dealing with manufacturer's liability will demonstrate that this "fault based defective product" theory should not be viewed as either radical or novel to established precedents in our jurisdiction.

*Atkins, supra* at 140.

I shall return to the foregoing arguments presently. For the moment, however, I would direct your attention to the fact that another rationale for adoption of a hybrid form of strict liability lurks just below the surface of *Casrell* and *Atkins*. I refer to Alabama's wrongful death act, which has been *repeatedly* construed by the Supreme Court as allowing only the recovery of punitive damages.

Consequently, damages are based upon the defendant's *culpability,* and compensatory damages may not be recovered. Adoption of the *Restatement* no-fault concept of strict liability would present serious problems in actions brought under the wrongful death statute as construed by the supreme court since there would be no culpability on which an award of damages could be based. *Thus, the Alabama Supreme Court's adoption of a fault-based version of strict liability was the only practical course of action short of reversing a long line of authority interpreting the wrongful death statute.*

Note, 28 *Ala.L.Rev.* 747, 759 (1977) (emphasis added). That, I submit, is the *real,* bottom-line, reason for the *Casrell/Atkins* hybrid.

(2) *Recovery of Economic Losses Under the Alabama Extended Manufacturer's Liability Doctrine*

Even though the preceding observations concerning the reasons for our Supreme Court's adoption of a hybrid form of strict liability might appear, upon first reading, to be nonsequiturs, reflection should prove that to be false. For, indeed, those threads are clues which lead this court to believe that the Alabama Supreme Court would allow the recovery of economic losses under the facts of this case.

(a) *No substantive difference between AEMLD and strict liability*

The first point supporting that conclusion is this: *if* the Alabama wrongful death act is (as I contend) the point which really determined the judgment in *Casrell* and *Atkins,* and led to the formulation of a hybrid form of action *ostensibly* based upon the culpability of the defendant,[34]

---

**34.** It should not be overlooked in this regard

that, just three years prior to *Casrell* and

then Alabama's doctrine should *not* be viewed as *sui generis,* or as radically different from strict tort liability generally.[35] Any distinctions that may be drawn between the two approaches must be viewed as differences in emphasis merely, but *not* substantive variances. And if that is true, as I believe it to be, then it also is probable that our Supreme Court would follow that increasingly clear trend of authority which allows the recovery of economic losses under strict liability principles (see the discussion under sub-section (A)(3), *supra*).

(b) *Economic losses recoverable as ancillary to "property damage"*

The second point leading this court to conclude that the Alabama Supreme Court would allow the recovery of economic losses under the facts of this case is simply this: the presence of collateral damage to property other than the defective products themselves.

In addition to the costs of removing asbestos products from the public school buildings in which they were installed, plaintiff also must pay for the removal, and replacement, of carpets, upholstery, and other porous materials into which microscopic asbestos fibers may have settled over time. Plaintiff attached a copy of a November 24, 1976 Raybestos Manhattan memorandum to its brief which indicates the asbestos industry is aware that such fibers cannot be satisfactorily removed from fabrics by normal methods.

It is also important to prevent workers from taking asbestos fibers into their homes. Once fiber gets into the home and becomes embedded in carpeting, upholstery, etc. it is virtually impossible to get rid of it. Home vacuum cleaners will not get rid of the fiber but will simply recirculate it. Exposure then becomes a 24 hour a day, 7 day a week matter, with young children being particularly at risk....

(Plaintiff's *Brief:* Attachment A.) The dangers of asbestos products also have been noted in judicial opinions. See, *e.g., Moran v. Johns–Manville Sales Corp.,* 691 F.2d 811 (6th Cir.1982); *Karjala v. Johns–Manville Products Corp.,* 523 F.2d 155 (8th Cir.1975); *Bertrand v. Johns–Manville Sales Corp.,* 529 F.Supp. 539 (D.Minn. 1982).

Even though some defense counsel spoke derisively of these "property damage" claims during oral argument, the cost of removing and replacing carpets, upholstery, and other porous materials from more than a score of school buildings will not be insignificant. Consequently, under accepted approaches the recovery of any so-called "economic losses" should be allowed as ancillary to plaintiff's right to recover for its "property damage." *Cf., Federal Mogul Corporation v. Universal Construction Co.,* 376 So.2d 716 (Ala.Civ. App.), *cert.denied,* 376 So.2d 726 (Ala. 1979). *See also, Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.,* 395 So.2d 991 (Ala.1981).

---

*Atkins,* Justice Maddox had predicted the Alabama Supreme Court would "adopt the doctrine of strict liability set out in the Restatement." *Geohagan v. General Motors Corp.,* 291 Ala. 167, 172, 174, 279 So.2d 436, 440, 442 (1973) (Maddox, J., concurring specially). Of course, that did not occur, and lends some weight to the contention that the wrongful death aspects of *Casrell* and *Atkins* really

were the reasons for creating AEMLD. *See also, Atkins v. American Motors Corp., supra* at 144.

**35.** *See,* Note, 28 *Ala.L.Rev.* 747, 756 (1977) ("... the Extended Manufacturer's Liability Doctrine ... bears a strong resemblance to the *Restatement* theory.... [T]he differences between the two theories are few....")

### (c) *The dangerous-nondangerous distinction*

Thirdly, this court also believes the Alabama Supreme Court will join that growing number of jurisdictions which have embraced the "dangerous-nondangerous" distinction, and will hold that a plaintiff may recover damages for *all* losses if the defective product causes—*or creates a substantial and unreasonable risk of causing*—personal injury or damage to property other than the defective product. Conceptually speaking, the "dangerous-nondangerous" distinction appears to be the best approach that has been devised to date for separating contract/warranty actions from tort cases.

Generally speaking, those cases which have held that economic losses are recoverable *only* under the warranty provisions of the Uniform Commercial Code have been confronted with defects which affected the product's *performance,* but did not present an unreasonable risk of harm to persons or other property. The rationale behind such cases was expressed by Chief Justice Traynor in *Seely,* as follows: a consumer "can ... be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." *Seely v. White Motor Co., supra* at 18, 45 Cal.Rptr. at 23, 403 P.2d at 151. Such express manufacturer agreements, or warranties, are covered by the Uniform Commercial Code.

In this case, however, we are not talking about a breach of *expectation interests.* The School Board does *not* question the "quality" of the asbestos installed in its buildings, *nor* does it contend that the products have failed to perform their insulation function satisfactorily. (Indeed, except for the ceramic tiles installed on NASA's space shuttle, there probably is no better insulation material than asbestos.) Rather, plaintiff's complaint is that the asbestos is extremely, unreasonably *hazardous.* Plaintiff's allegations in this regard must, in ruling on the motions to dismiss, be accepted as true. *Pruitt v. Pruitt,* 343 So.2d 495, 497 (Ala.1977). But this court has no doubt they will be proven. As noted in the preceding sub-section, several courts already have taken note of the extreme hazards of asbestos. For instance, in *Bertrand v. Johns–Manville Sales Corp., supra* at 544, the U.S. District Court for Minnesota said there could be little argument over the fact that:

> asbestos dust can cause diseases such as asbestosis and mesothelioma. This proposition is so firmly entrenched in the medical and legal literature that it is not subject to serious dispute.

This case is not instituted, therefore, by a *disappointed* user. Rather, it has been brought by the School Board on behalf of those persons who are *endangered* by the defendants' products. The distinction was colorfully drawn quite recently by one of my black-robed brethren in the State of Kentucky, who also was lucky enough to be assigned a similar case.

> This is not a claim for the cost of a replacement part or product which failed to perform as expected. So far as the Court can tell from the record, the [School] Board makes no claim that the asbestos acoustical ceilings are not perfectly satisfactory *as ceilings.* It is the unreasonable risk to humans which they pose which requires the Board to remove such ceilings. A similar problem which was much publicized recently was that in which restaurant tables were found to contain radioactive steel. They apparently would have been perfectly suitable as restaurant tables so long as the diner wore a lead suit or elected to glow in the dark, but obviously had to be removed because of the risk they posed.

*Hopkins County Board of Education v. National Gypsum Company,* No. 83–C1–306 (Hopkins Co.Cir.Ct., filed July 12, 1984), at p. 4 (Spain, C.J.).

It would thus seem that, in the present case, the School Board has undertaken an asbestos abatement program in order to fulfill both the plaintiff's and the defendants' *tort duty* to protect "consumers" of the respective products from the risk of unreasonable harm. [See Ramp, *The Impact of Recall Campaigns on Products Liability,* 44 *Ins. Couns. J.* 83 (1977), for a discussion of those cases holding that manufacturers must take post-sale remedial measures once an excessive danger is discovered in a product line.] In the mind of this court, therefore, plaintiff should be allowed to recover in tort for the losses incurred as a result of the abatement program, because the expenses really are *not* "economic losses" in the sense of an *expectation loss* but, rather, the expenses have been incurred to fulfill all parties' *tort duties* to the true "consumers" of the products. Furthermore, an injury to a person should not be a prerequisite to the action; it should be enough that the products present clearly unreasonable risks of harm, or death. To require that some small child, children, or teachers be injured before allowing this action to lie would contradict the policies of consumer protection, risk allocation, and deterrence upon which strict liability is founded. Moreover, it should be noted that the Uniform Commercial Code is particularly inappropriate as a remedial vehicle in a case of this nature because it is not particularly concerned with product safety for the intended consumer. Rather, the UCC is primarily concerned with contract notions of losses on bargains, and the reasonable expectations of parties to a bargain. It is essentially neutral on the issue of consumer safety. *See, e.g.,* Ribstein, *Guidelines for Deciding Product Economic Loss Cases, supra.*

Of course, the preceding propositions have not been specifically approved by our State's Supreme Court. Unfortunately, this is a case of first impression in Alabama. Nonetheless, there are hints in *Casrell* and *Atkins* that such an analysis would be approved. For example, it will be recalled that Justice Faulkner said:

> As long as there is a causal relationship between the defendant's conduct and the defective product, *he is held liable because he has created an unreasonable risk of harm. Liability*—subject to allowable legal defenses—*attaches solely because the defendants have exposed expected users* of a product not reasonably safe *to unreasonable risks.* This is morally and legally correct.

*Casrell v. Altec Industries, Inc., supra* at 132 (emphasis supplied). Justice Jones summed it up when he said: "We simply hold that *selling a dangerously unsafe product is negligence* as a matter of law." *Atkins v. American Motors Corp., supra* at 141 (emphasis supplied).

> The fault of the manufacturer ... is that he had conducted himself unreasonably in placing a product on the market which will cause harm when used according to its intended purpose. *The manufacturer ... is held liable because he has created an unreasonable risk of harm.*

*Id.* at 140 (emphasis supplied). It takes only one short step from the preceding propositions to reach the conclusion that the "expectation-bargain protection policy of warranty law" does *not* apply to this case, but that the "safety-insurance policy of tort law" *does. Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., supra* at 1173. A United States District Judge in New Jersey applied this same rationale in a similar case.

In the instant case, the problem with [U.S. Gupsum's] product is not that it

did not perform its function in the ceiling plaster, but rather that it posed a grave risk of personal injury to those in contact with it. Thus, the manufacturer's responsibility to guard against making a product which entails risk of personal harm or property damage, a major concern underlying the doctrine of strict liability in tort, is involved in this case. The case does not primarily involve a problem with the product which mandates its replacement or repair in order to perform its function, or a loss of profit stemming from a defect in the product's performance, but rather the replacement of the product because of a grave personal safety risk.

*Cinnaminson Township Board of Education v. U.S. Gypsum Co.,* 552 F.Supp. 855, 859 (D.N.J.1982).

(d) *The demise of the UCC as a viable remedy in cases involving unreasonably dangerous products*

The final point which, in the opinion of this court, indicates that the Alabama Supreme Court will allow the recovery of "economic losses" in this case may be viewed by some as heretical. But it nonetheless needs to be stated, and placed face-up on the table for discussion. In unvarnished form, the point can be stated thusly: the Alabama Supreme Court has displaced, by judicial fiat, the UCC's warranty rules insofar as they relate to product defects causing—*or creating a substantial and unreasonable risk of causing*—personal injury or damage to other property. A proper understanding of this contention requires some backtracking along the historical path that has been traced before.

It first must be recalled that the development of strict tort doctrine occurred almost entirely as a matter of common law development, rather than legislative action. The two modern cornerstones of that doctrine—*Henningsen* and *Greenman*—were laid down several years *before* the Uniform Commercial Code became effective in their jurisdictions. (*Henningsen* was decided in 1960, and the UCC became effective in New Jersey on January 1, 1963. *Greenman* was decided in 1963, but the Code did not become effective in California until January 1, 1965.) Thus, the doctrine which those two decisions spawned "is not grounded upon statutory authority but represents an attempt to respond intelligently to the needs of the modern consumer." McDonnell, *The New Privity Puzzle: Products Liability Under Alabama Uniform Commercial Code,* 22 Ala.L.Rev. 455, 458–459 (1970).

On the other hand, *Santor v. A and M Karagheusian* (decided Feb. 17, 1965) was handed down *after* the effective date of the UCC in New Jersey. (This also was true in the California *Seely* case, decided on June 23, 1965.) Hence, the critical eruption following *Santor,* and the charge that the New Jersey Supreme Court was totally displacing the UCC's warranty provisions by "open judicial defiance of apparent statutory commands." Franklin, *When Worlds Collide, supra* note 18 at 990. The reverberations of the critical explosion that *Santor* ignited are heard still—in this case, in fact—as courts which adopted strict liability *after* the UCC became effective in their jurisdictions have gone about "the difficult task of working out an accomodation between their new case law and the Code's statutory rules on sales warranties." McDonnell, *supra* at 459.

If all that has been said from the time of *Santor* to the present is put in proper perspective, it can clearly be seen that the only reason for drawing a line between "personal injuries & property damage" on one side, and "economic losses" on the other, has been that of trying to preserve a

sphere of operation for the UCC's warranty provisions. All of the judicial (not to mention lawyer) blood, sweat, and tears that are reflected in the ninety-odd decisions this opinion has attempted to understand was spilled for no reason other than that. In Professor McDonnell's apt description, all of that effort expended in the attempt to accommodate "the Commercial Code to new tort doctrines is the present price for past judicial innovations—*a cost which Alabama has successfully avoided.*" *Id.* at 460 (emphasis supplied).

*Indeed!* Avoided how? By *modifying* the official 1962 version of the Uniform Commercial Code recommended for State adoption! A close reading of Professor McDonnell's thoughtful, and carefully constructed, article demonstrates that it was

> designed to show how the Alabama legislature in modifying the Commercial Code has given the consumer personally injured by defective goods *a remedy similar to that afforded by other states under the label of strict tort liability.*

*Id.* at 487 (emphasis supplied). In the same paragraph, Professor McDonnell goes on to explain that the elements of the remedy fashioned by the Alabama legislature

> are similar to but not identical with what [a consumer] would have to plead and prove under section 402A of the Restatement. He must show that the product was defective or "unmerchantable" and that the defect proximately caused his injury. He need not show privity of contract with the defendants if it was reasonable to expect him to use, consume, or be affected by the product. Disclaimer provisions in the contract will not bar his action if consumer goods are

involved and he has suffered personal injury. Simple negligence on his part contributing to the injury will not defeat his claim, but if he uses the product in a manner in which it was not intended to be employed, he may meet the objection that the item was not actually unmerchantable. And if he perceives the imperfection and danger attached to it and chooses to continue using the product, a serious question arises whether the defect can be said to be the proximate cause of the injury. The only traditional contract restriction which may be applicable to his warranty claim is the need to give notice of breach of warranty to the seller-defendant. The Alabama version retains the provision of the official 1962 text which requires a buyer who has accepted merchandise to give notice of breach within a reasonable time after he discovers, or should have discovered, the breach.... Aside from the notice obstacle, the personal injury claimant is free of contractual pitfalls. (*Id.* at 487–489.)

The Alabama version of the Uniform Commercial Code became effective in this state at midnight on December 31, 1966 (*Ala.Code* § 7–10–101 (1975)): *i.e.,* more than ten years prior to *Casrell* and *Atkins* (both decided and released May 21, 1976). And, Professor McDonnell's articulate interpretation of our Code provisions was published in the *Alabama Law Review* six years prior to those cases. Therefore, there is no basis for assuming that our Supreme Court Justices were not aware of the possible relevance of those Code provisions—or that they were unaware of *Santor* and its critical progeny—when they created the "extended manufacturer's liability doctrine." Rather, there is every reason to believe that our Justices were well aware of those matters and knew of what they were about.[36]

---

36. See K.N. Llewellyn, *The Bramble Bush* 14 (1930, 2d ed.1965):

> But if I am right, finding out what the judges *say* is but the beginning of your task.

> You will have to take what they say and compare it with what they *do*. You will have to see whether what they say matches with what they do. You will have to be

One important question that must be asked at this juncture is: "Why, then, did the Alabama Supreme Court ever contemplate the adoption of strict liability as formulated in the Restatement (see *Geohagan, supra* note 34), *or* adopt an indigenous variant of that doctrine which so closely resembles § 402A that it could be called a 'clone'?" The answer, I submit, is as stated before: The Alabama wrongful death act mandated that a fault-based version of strict liability be adopted as "the only practical course of action short of reversing a long line of authority...." Note, 28 *Ala.L.Rev.* 747, 759 (1977). In other words, AEMLD is just another of those prices that we must pay as a result of being the last State in the Union to hold that only punitive damages, based upon the culpability or fault of the defendant, may be recovered in a wrongful death action.

The overwhelming question that must be asked at this juncture, however, is this: "What is the effect of the AEMLD on our UCC warranty rules?" The answer, I submit, is: AEMLD has displaced, and superseded those rules in all cases where the plaintiff seeks damages for losses occasioned by a product defect causing—*or creating a substantial and unreasonable risk of causing*—personal injury or property damage. The Code's warranty rules will remain viable in those cases where the performance or quality *expectations* of the buyer/consumer have been breached, and in those cases where a plaintiff may find it necessary to bring an action based upon breach of express or implied warranties against intermediaries in the distributive chain (retailers or wholesalers) who escape AEMLD's noose *via* the "lack of causal relation" defense. Otherwise, in cases such as this one, where the deterrence of unreasonable risks of personal injury or death is the preeminent concern, AEMLD reigns supreme, it is a new remedy, eclipsing all that preceded it. It merges all of the desirable attributes of negligence, warranty, and strict liability into a single tort action. It rejects all possible limitations on tort recovery, as long as the product defect causes—or creates a substantial and unreasonable risk of causing (as in this case)—personal injury, death, or property damage.

Such a result—even if unanticipated by *Casrell* and *Atkins*—need not be deplored. Rather, it should be applauded for blending all of the desirable attributes of its predecessors into a single, integrated tort action. *Cf.,* Donovan, *The Emerging Confrontation, supra* note 3 at 257 & 260, where that author concludes by observing that, while the UCC played a significant role "in providing the impetus for needed judicial reform of the law of tort," *nonetheless:*

> It is fair to say that the Uniform Commercial Code has outlived much of its initial usefulness as a stopgap compensatory device in the consumer-injury situation.... [*Id.* at 257.]

\* \* \* \* \* \*

To this observer at least, it seems that ... the task of developing a proper degree of consumer protection is better left to courts. Judges can feel their way slowly from case to case and can better adjust where social conditions appear adversely affected by particular rules or variations. On the other hand, the statutory vehicle for change in the law is far too cumbersome, too prone to lobbyistic manipulation, and such too rigid as well.

distrustful of whether they themselves know (any better than other men) the ways of their own doing, and of whether they describe it accurately, even if they know it. [Emphasis in original.]

As Professor Littlefield points out, statutes too often create anomalies where the common law system of growth and development permits well-reasoned, flexible exceptions which appear all too necessary to a proper adjustment of today's uncertainties. [*Id.* at 260.]

### III. THE STATUTES OF LIMITATION

As noted at the beginning of this opinion, the main thrust of defendants' attack is centered on the notion that damages for economic losses are not recoverable in tort. They mounted one other assault of almost equal force, however. Defendants have argued, strenuously, that this action is barred by applicable statutes of limitation. After careful consideration, this court must disagree.

Beginning with the less difficult questions, this court finds that laches is not a bar to the action because plaintiff acted expeditiously from the alleged time of discovering the asbestos hazard to the date of filing suit. *Cotney v. Eason*, 269 Ala. 354, 113 So.2d 512 (1959).

Further, this court agrees with plaintiff that the amended complaint sufficiently pleads the time and circumstances of discovering the alleged fraud. *Associates Financial Services Co. Inc. v. First National Bank of Mobile*, 292 Ala. 237, 292 So.2d 112 (1974). The "Discovery rule" of *Ala. Code* § 6–2–3 (1975) thus applies to the fraud claim.

Finally, defendants' claim that the architects' and engineers' statute of repose [*Ala. Code* § 6–5–218 (1975)] bars this action is in error. Apart from constitutional problems with that statute [*Bagby Elevator and Electric Company, Inc. v. McBride*, 292 Ala. 191, 291 So.2d 306 (1974)], it applies only to those furnishing the "design, planning, supervision or construction of improvements to real proper-

ty." However, the asbestos companies are being sued as material suppliers. Consequently, they cannot claim the protection of the statute under its plain language. *See also, County of Loudon v. U.S. Gypsum Co.*, No. 3–83–329 (E.D. Tenn., filed Oct. 5, 1983) (holding that asbestos companies, as suppliers of material, are not entitled to immunity of architects' and engineers' statute of limitations [slip op. at 30]).

Turning now to the major statute of limitations issue, defendants contend that plaintiff's negligence and AEMID claims are barred by the one year statute of limitations found in *Ala. Code* § 6–2–39(a)(5) (1975). Plaintiff counters with the argument that its claims are permissible under two rules: Alabama's special asbestos statute of limitations; and, the "continuing tort" rule. After careful consideration, the court agrees with plaintiff on both points.

The Alabama asbestos statute of limitations [*Ala. Code* § 6–2–30(b) (Supp.1983)] provides in pertinent part:

A civil action for any injury to the person or rights of another resulting from exposure to asbestos, including asbestos-containing products, shall be deemed to accrue on the first date the injured party, through reasonable diligence, should have reason to discover the injury giving rise to such civil action....

During oral argument, counsel engaged in heated debate over the language of this statute, as well as its legislative history. Defendants contend that the statute should be limited to personal injury actions, while plaintiff claims the statute encompasses property damage claims as well.

The court starts, as it must, with the language of the statute. On its face, the statute is unambiguous. It applies to two

types of asbestos suits: one for injuries to the "person," and one for injuries to the "rights of another." This alone casts doubt on defendants' claim that the statute is limited to injuries to the person. The legislature easily could have stated that the statute should apply only to "bodily injury" or "personal injury," but it has not done so.

Defendants suggested at oral argument that the phrase, "rights of another," is intended to refer to derivative claims in personal injury suits (such as loss of consortium). The court cannot read such an interpretation into the statute without some indication that this type of limitation of the term is what was meant.

Furthermore, defendants are arguing against their own position. As previously noted, they contend that plaintiff's claim is governed by the one year limitation of *Ala.Code* § 6–2–39(a)(5) (1975) (*e.g.,* Brief of Nat'l Gypsum at 8–9). That statute applies to:

> Actions for *any injury to the person or rights of another* not arising from contract and not specifically enumerated in this section; .... [Emphasis supplied.]

Thus, when it appears to help their position that plaintiff's tort claims are barred by the one-year statute, defendants assert that plaintiff's claim is one "for any injury to the person or rights of another." *Ala. Code* § 6–2–39(a)(5). In the next breath, however, and without any apology for the obvious inconsistency, defendants contend that plaintiff's claim is *not* one "for any injury to the person or rights of another" for purpose of the asbestos statute of limitations. *Ala.Code* § 6–2–30(b) (Supp. 1983). Defendants cannot have it both ways.

Defendants' claim that the asbestos statute is limited to injuries to the person also is weakened by that clause of the statute giving an "injured party" a right to sue after discovering an asbestos "injury." If the legislature intended to limit the statute as defendants contend, it easily could have said the "injured person" could sue after discovering his *"bodily* injury."

Defendants next urge that the legislative intent of the statute, as expressed in Act No. 80–566 (1980), shows the legislature meant to limit the statute to personal injuries. The court disagrees. While it is highly questionable that this court should even attempt to examine legislative intent when a statute is unambiguous [*State v. Dawson,* 264 Ala. 647, 89 So.2d 103 (1956) ], the court nonetheless will review the legislative material cited to it, to determine the legislative intent. *McDonald's Corporation v. DeVenney,* 415 So.2d 1075 (Ala.1982).

There is no question about the fact that, at the time of enacting the asbestos exposure statute, the legislature was greatly concerned with the situation in Alabama whereby victims of asbestos exposure were denied recovery under then existing statutes of limitation. The question to be answered, however, is whether the legislative intent necessarily shows a limitation of this concern to personal injury victims of asbestos exposure. The court believes it does not.

The best that can be said is: the legislative history is ambiguous. For instance, the Act which created the statute states that the intent of the legislature was:

> to assure that the statute of limitations *for injuries* or deaths caused by exposure to asbestos, including asbestos-containing products, does not run on any Alabama *citizen* before that *citizen* has at least the opportunity to discover that cause of action.

Act. No. 80–566, § 1 (1980) (emphasis supplied). The use of the word, "injuries" (as in the statute), instead of *"personal* inju-

ries," again indicates a broader scope for the statute than defendants concede.

However, defendants argue that the words, "Alabama *citizen*," limit the statute to *natural persons*. The court does not believe that the legislature meant the term in the technical sense as one of limitation. Rather, it is used as a word of general description. But, even if it be conceded the word "citizen" was used technically, this court still does not believe it excludes the plaintiff School Board. Had the legislature meant to limit the statute to *natural* persons it could have said so. It has done so in other contexts, such as in *Ala.Code* § 8–19–3(2) (Supp.1983), where it defines "consumer" as a "natural person."

Further legal research also has uncovered various definitions of "citizen." Thus, in situations where natural persons would be expected to be the only affected entities, such as in voting or civil liberties cases, the term "citizen" understandably is used in a restrictive sense. For instance, only natural persons can vote, and "citizen" would be expected to refer to such individuals in that context, as it does. *Gardina v. Board of Registrars*, 160 Ala. 155, 48 So. 788 (1909). Likewise, in securing "civil and political rights," one expects the normal usage of the term "citizen" to refer to those natural persons who would exercise such rights. This, in fact, is the use of the term in Article 1 of the *Alabama Constitution*, which discusses individual liberties.

In other contexts, however, the term is given a different, and less restrictive meaning. This is in accordance with the rule that terms in statutes should be given their ordinary and everyday meaning in the context within which they are used. *Fuller v. Associates Commercial Corp.*, 389 So.2d 506 (Ala.1980). For example, a corporation cannot vote. It nonetheless would be ridiculous to assert that, because a corporation is not a citizen for voting purposes, it cannot be a citizen for other purposes. In fact, it is well accepted that a corporation is a citizen of the state in which it is incorporated for diversity of citizenship purposes. *E.g.*, *Miller Production Co. v. Champlin Petroleum Co.*, 505 F.Supp. 46 (D.Okla.1980). There is nothing inconsistent between the inclusion of a corporation as a "citizen" for this purpose, and excluding it for voting purposes. The difference is a natural consequence of the settings in which the term is used. Simply stated, a corporation can sue and be sued, but it can't vote.

In like manner, Alabama law recognizes that the term "Alabama citizen" must be read in the context of its use. It has already been noted that "citizen" refers to natural persons in voting cases. *Gardina v. Board of Registrars, supra.* However, in *Ezzell v. First National Bank of Russellville*, 218 Ala. 462, 119 So. 2 (1928), it was held that a bank was an Alabama citizen which could be sued by a mortgagor to prevent foreclosure of a mortgage. In pertinent part, the court said:

> National banks as to such matters [suits to redeem property] are citizens of the state of their domicile. ... [*Id.* at 464, 119 So. at 3.]

Applying these principles to this case, it is the judgment of this court that the School Board is an "Alabama citizen." The asbestos statute of limitations concerns the right of an "Alabama citizen" to sue for "injuries" from asbestos exposure. Its subject is thus not one from which a school board is excluded by nature, like voting. There is little question that a school board could suffer "property damage" or "economic loss" injury from asbestos exposure. (And, indeed, plaintiff alleges that it has.) Moreover, other governmental entities, such as cities and counties, have specifically been held to be citizens of the state in which they are

located for the purpose of suing for injuries in federal court. *Moor v. Alameda County*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).[1] Therefore, if the defendants are right, and had the School Board sued in federal court, the anomolous situation would arise that it would be an "Alabama citizen" for diversity purposes, but not an "Alabama citizen" for the purposes of the statute of limitations. This court does not believe that this result is desirable, or logically supportable. The School Board is an "Alabama citizen" for purposes of *Ala.Code* § 6–2–30.

Defendants next contend that, if the School Board is found to be an "Alabama citizen," it still cannot be "suffering the effects of any long-term disease process," another phrase found in the legislative history. Again, the court believes that, by this language, the legislature was describing its primary concern, but not excluding other victims of asbestos exposure. In a very real sense, the School Board is suffering the effects of the asbestos "disease *process*" which begins with release of asbestos fibers. In fact, it is suffering such effects more directly than "loss of consortium claimants" (whom defendants assert are the other intended beneficiaries of the statute) because the School Board's property and personnel are exposed to the fibers themselves. If the legislature indeed meant to limit the remedial benefits of the statute only to those natural citizens suffering the effects of asbestos "*disease,*" instead of an asbestos "disease *process*," it could have said so. But it did not, and this court is, therefore, extremely reluctant to pick and choose among the words of the

legislative history, or to delete some words, as the defendants' view suggests.

This court gleans some support for its position from the description of the asbestos statute in *Cazalas v. Johns–Manville Sales Corp.*, 435 So.2d 55 (Ala.1983), where the Alabama Supreme Court described it as applying to "*all* civil cases arising out of exposure to asbestos...." *Id.* at 56 (emphasis supplied). While *Cazalas* was a personal injury case, the broad description given to the statute by the Supreme Court is, in this court's opinion, consistent with the legislature's overall intent.

Further support is found in the school asbestos opinion referred to earlier [*County of Loudon v. U.S. Gypsum Co.*, No. 3–83–329 (E.D. Tenn, 1983, filed Oct. 5, 1983) ], in which that court addressed a statute applying a favorable limitations period to "any action resulting from exposure to asbestos." (Slip op. at 11.) This closely resembles our statute which applies to "a civil action for any injury to the person or rights or another resulting from exposure to asbestos." *Ala.Code* § 6–2–30(b). The defendants in *County of Loudon* cited the federal magistrate to much stronger language in the Tennessee legislative history purporting to show a legislative intent to limit the favorable effects of the statute to "asbestosis" (Slip op. at 14). Nonetheless, the court rejected such a narrow construction of the statute. Instead, it found that in enacting the statute:

> the legislature indicated that it was aware of the special problems faced by the asbestos plaintiff. One problem, of course, is the twenty or thirty year gestation period of the desease asbestosis. *Another is that the dangers of asbestos exposure were not generally known by*

---

**1.** *Moor* overruled a lower court opinion which had relied on an earlier case holding that a school board was *not* a citizen. See,

*Moor v. Madigan,* 458 F.2d 1217 (9th Cir. 1972).

*the public until relatively recently. The plaintiff in this case faces those problems as surely as do plaintiffs bringing actions solely for personal injury from exposure to asbestos.* [Slip op. at 15–16 (emphasis supplied).]

In like manner, the plaintiff School Board in this case also is a victim of the ignorance of the general public about the hazards of asbestos. This court therefore finds the general intent of the legislature to aid such victims controlling over a contrary intent that can only be distilled by parsing selected phrases from the legislative history. The statute is a remedial one. As such it should receive a liberal construction, to effectuate the legislature's overall purpose.

Finally, defendants have contended, both in their briefs and at oral argument, that *Cazalas v. Johns–Manville Sales Corp., supra,* renders application of *Ala. Code* § 6–2–30 to plaintiff's claim unconstitutional. This court disagrees. *Cazalas* held that § 6–2–30 applies to extend the benefits of the discovery rule to claims involving "exposure on or after May 19, 1979." *Cazalas v. Johns–Manville Sales Corp., supra* at 57. Plaintiff's school buildings were unquestionably exposed to asbestos after that date and, under *Cazalas,* the statute applies.

Apart from the asbestos statute of limitations, plaintiff contends that the "continuing tort" rule applies and allows this suit. In response, defendants claim that the rule is limited to claims for personal injuries. The cases, however, seem otherwise. In *Moon v. Harco Drugs, Inc.,* 435 So.2d 218 (Ala.1983), for example, the Su-

preme Court had occasion to review the continuing tort rule. It cited as examples of the rule *American Mutual Liability Insurance Co. v. Agricola Furnace Co.,* 236 Ala. 535, 183 So. 677 (1938), and *Employers Insurance Co. v. Rives,* 264 Ala. 310, 87 So.2d 653 (1955). While neither of these cases was, strictly speaking, a tort case, they both analyzed tort principles in reaching their decision. It is presumably for this reason that they were cited as "continuing tort" cases in *Moon.* Thus, in *American Mutual Liability,* the court found that the long-term release of dust was both tortious and an accident. In *Employers Insurance,* the court dealt with the slow contamination of a well by gasoline that had been released into the ground by faulty workmanship on a fuel line. The leak was repaired, but the gasoline already in the ground continued to leak into an adjoining landowner's well. In the context of an insurance scenario, the Supreme Court found that an "accident" had occurred.

There can be little doubt that the continuing tort rule has vitality today in asbestos cases. In *Cazalas v. Johns–Manville, supra,* the Supreme Court reversed part of the trial court's decision because of its "misunderstanding of the continuing tort rule of damages." *Id.* at 57.

Plaintiff contends that a logical marriage of *Cazalas* (asbestos exposure) with *Employers Insurance* (slow property contamination) leads to the conclusion that slow property contamination by asbestos exposure also is a continuing tort. With this contention, the court must agree.[2] Like the situation in *Employers Insurance,* where the gasoline was released into the ground to seep out gradually, the asbestos has been put into the ceiling to fall out gradually.[3] Defendants have suggested no

2. The continuing tort rule is of little use to most personal injury plaintiffs because they would have to sue within one year of last exposure to asbestos which, for most plaintiffs, was years ago.

3. *Moon v. Harco Drugs,* 435 So.2d 218 (Ala. 1983), which cites the continuing tort cases discussed in the text, does not argue against application of the rule here for two reasons. First, the injury there was complete each time plaintiff injected herself; here the danger ap-

satisfactory basis for distinguishing these cases. The court thus finds the continuing tort rule to be applicable here.[4]

## IV. CONCLUSION

The remaining contentions which defendants have thrown against plaintiff's claims have not been extensively argued. Those contentions really appear to be a "rear guard," detached from defendants' two main arguments, and intended to be brought up to protect the rear in case of a retreat. If so, that circumstance has now occurred. But this court does not intend to discuss the remaining contentions in any detail. Consideration of those does not indicate that such is required; the arguments are without merit. To the extent that any response is necessary, this court adopts the arguments found in the brief filed by plaintiff in opposition to the defendants' motions.

In conclusion, therefore, this court is of the opinion that the various motions to dismiss, for judgment on the pleadings, or for summary judgment filed by all defendants (except Davis Speake & Associates) should be overruled and denied. An order to that effect shall be rendered contemporaneously herewith.

DONE this 27th day of August, 1984.

parently increases over time. Second, the *Moon* court must have considered its situation different from the slow contamination of person and property caused by asbestos since: (1) it was decided on the same day as *Cazalas v. Johns–Manville*, which affirmed the continuing tort rule in asbestos personal injury cases; and (2) it cited *Employers Insurance* as a viable example of the continuing tort rule.

4. With respect to the claim of conspiracy, although there are no Alabama cases on point, it appears generally settled that the statute of limitations on a conspiracy claim does not begin to run until the last overt act pursuant to the conspiracy has been committed. *E.g., Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 157 Cal.Rptr. 392, 598 P.2d 45 (1979) *(en banc )*. Plaintiff alleges that the conspiracy continued up to the date of its independent discovery of the asbestos in its schools. (Complaint ¶ 23.) This is sufficient to defeat defendants' motions on this point.